ISAAC TRAVER, PLAINTIFF IN ERROR, V. THE BOARD OF COUNTY COMMISSIONERS OF MERRICK COUNTY, DEFENDANT IN ERROR.

Internal Improvements. A water grist mill erected for public use, the rates of toll to be determined by the county commissioners, and being subject to regulation by the legislature, is a work of internal improvement within the meaning of the act of 1869, and bonds voted to aid its construction are valid. COBB J., dissenting.

ERROR to the district court for Merrick county. Tried below before GEORGE W. POST, J.

*John Patterson,* for plaintiff in error, cited: *Weismer v. Village of Douglas,* 64 N. Y., 99. *Allen v. Inhabitants of Jay,* 60 Me., 124. *Brick Company v. Inhabitants of Brewer,* 62 Me., 62. *National Bank of Cleveland v. City of Iola,* 9 Kas., 689. *Curtis v. Whipple,* 24 Wis., 350, 354, 355. *Weeks v. Milwaukee,* 10 Wis., 242, 263. *Lowell v. Boston,* 111 Mass., 454. *Jenkins v. Andrews,* 103

Mass., 94. *Memphis Freight Company v. Memphis*, 4 Caldw. (Tenn.), 419, 425. 20 Wall., 655. *Dawson County v. McNamar*, 10 Neb., 276. *Guernsey v. Township*, 4 Dill., 372.

*A. J. Poppleton* (*W. H. Webster* with him), for defendants in error, cited: *Leavenworth v. Miller*, 7 Kan., 527. Comp. Stat., 355. *U. P. R. R. v. Colfax Co.*, 4 Neb., 455. *Fremont Building Ass'n v. Sherwin*, 6 Neb., 48. *Burlington v. Beasley*, 94 U. S., 313.

MAXWELL, J.

This is an action to enjoin the defendant from levying taxes to pay certain bonds issued to J. G. Brewer to aid in the erection of a water grist mill in Merrick county. The defendants demurred to the petition, and the demurrer was sustained and the action dismissed.

It is alleged in the petition in substance that on or about the 1st day of February, 1872, the county commissioners of Merrick county submitted to the electors thereof the question of voting bonds to said Brewer in the amount of $6,000, to draw interest at 10 per cent, to aid in the erection and maintenance of a flouring and grist mill at or near Lone Tree, now Central City, in said county; that said proposition was adopted and the bonds issued and sold and the mill erected as provided; that said commissioners are about to levy $5,000 to pay the amount due on the principal of said bonds, and the further sum of $600 as interest thereon.

It is also alleged that the bonds on their face show that they were issued for an illegal purpose. The bonds are in the following form:

MILL BOND.

UNITED STATES OF AMERICA.

MERRICK CO. MILL BOND, STATE OF NEBRASKA.

Ten years after date, for value received, the county of

Merrick, in the State of Nebraska, promises to pay ........
or bearer,

ONE HUNDRED DOLLARS,

Lawful money of the United States, at the office of the
County Treasurer of said county, with interest at the rate
of ten per cent per annum from date until paid; said inter-
est payable at the "National Park Bank" in the city of
New York semi-annually, on the 1st day of August and
1st day of February in each year, on the presentation of
the coupons hereto annexed. This bond is one of a series
of sixty of like tenor, date, and amount, issued as a loan to
the said James G. Brewer to aid him in building a public
grist mill and water power in said county of Merrick, on
section thirty-one (31), township thirteen (13) north, range
six (6) west, authorized by the laws of the state of Nebras-
ka, and issued pursuant to a vote of the legal voters of said
county, at a special election regularly held on the 9th day
of January, A.D. 1872, authorizing their issue, and pro-
viding for the payment of the principal and interest at
maturity.

In testimony whereof, we, the county commissioners of
said county, have hereunto subscribed our names, and have
caused this to be attested by the county clerk of said coun-
ty, with the seal thereof hereto affixed, and the annexed
coupons signed by said county clerk.

Dated at Lone Tree, Nebraska, February 1st, 1872.

The question for determination is, is a water grist mill a
work of internal improvement within the meaning of the
statute?

The act of February 15th, 1869, provides as follows:

"Sec. 1. That any county or city in the state of Nebras-
ka is hereby authorized to issue bonds to aid in the con-
struction of any railroad, or *other work of internal improve-
ment*, to an amount to be determined by the county com-
missioners of such county or the city council of such city,
not exceeding ten per centum of the assessed valuation of

all taxable property in said county or city; *Provided*, The county commissioners or city council shall first submit the question of issuing such bonds to a vote of the legal voters of said county or city, in the manner provided by chapter nine of the Revised Statutes of the state of Nebraska, for submitting to the people of a county the question of borrowing money."

Section 2 provides that: "The proposition of the question must be accompanied by a provision to levy a tax annually for the payment of the interest on said bonds as it becomes due; *Provided*, That an additional amount shall be levied and collected to pay the principal of said bonds, when it shall become due; and *Provided further*, That no tax shall be levied or collected to pay any of the principal of said bonds until after the year 1880."

The act relating to mill dams, which took effect Feb. 26, 1873, provides as follows:

"Section 1. If any person desiring to erect a dam across any water-course for the purpose of building a water, grist, saw, carding, or fulling mill, or of erecting any machinery to be propelled by water, be the owner of the lands on which he desires to build such mill or erect such machinery, on one side of such water-course and not of the lands on the opposite side against or upon which he would abut his dam; or, if any person be the owner of the lands on which he desires to erect any such mill or machinery on both sides of such water-course; or, if any person shall have erected such mill and mill-dam on his own lands, he may file a petition for leave to build or continue such mill-dam and for a writ of *ad quod damnum* in the district court of the county where such lands lie, against the owners or proprietors of the lands above and below such dam, which are or probably will be overflowed or injured thereby, or against or upon which he may desire to abut a dam."

Section 2 provides that: "The plaintiff shall set forth in his petition, as near as may be, the place where such dam

is built, or proposed to be built, the height or proposed height of such dam, the kind of mill built or proposed to be built, his title to the lands whereon he has erected or proposes to erect such mill or machinery, whether legal or equitable, and shall describe with certainty the lands above and below the dam, the property of others which are or will probably be overflowed or injured as aforesaid, and shall give the name of the owner of each tract, or if the name of any such owner be unknown, the plaintiff shall so state in his petition."

Section 24 provides that: "When the water backed by any mill-dam belonging to any mill or machinery is about to break through or over the banks of the stream, or to wash a channel so as to turn the water of such stream, or any part thereof, out of its bed or ordinary channel, whereby such mill or machinery will be injured or affected, the owner or occupier of such mill or machinery, if he do not own such bank or banks, or the lands lying contiguous thereto, may, if necessary, enter thereon, and erect and keep in repair such embankments, fortifications, and other works, as shall be requisite to prevent such water from breaking through or over the banks of such stream, or washing a channel as aforesaid, such owner or occupier committing thereon no unnecessary waste or damage."

Section 25 provides that: "Nothing contained in the last preceding section shall be construed to bar the owner of such bank or banks, or lands lying contiguous thereto, from recovering the amount of any injury which he may have actually and in fact sustained by the erection or repair of such embankment, fortification, or other works."

Section 26 provides that: "If any person shall injure, destroy, or remove any such embankment, fortification, or other works, the owner or occupier of such mill or machinery may recover of such person all damages which he may sustain by reason of such injury, destruction, or removal."

. Section 27 provides that: "All mills within this state now in operation, or which hereafter may be put in operation, for grinding wheat, rye, or corn, or other grain, and which shall grind for toll, shall be deemed public mills."

Section 28 provides that: "The owner or occupier of every public mill within this state shall grind the grain brought to his mill as well as the nature and condition of his mill will permit, and in due time as the same shall be brought."

Section 29 provides that: "The owner or occupier of every public mill shall cause a statement of the rates of toll by him charged for grinding and bolting the different species of grain to be posted in at least two conspicuous places within the mill; and such statement shall be either written or printed in a plain and legible manner, and the county commissioners of each county shall establish and regulate the amount of toll allowed to be charged."

In *Nosser v. Seeley*, 10 Neb., 460, it was held that a person who in good faith had commenced the erection of a grist mill on a stream could, after a considerable sum was expended in the erection of the mill, enjoin a party from erecting a dam across the stream on his own land, the effect of which would be to destroy the water power of the first occupant. This decision was adhered to in *Seeley v. Bridges*, 13 Neb., 547, and may be regarded as the settled law of this state.

The legislature has authority, without doubt, to provide that streams capable of being applied to mill purposes shall be so utilized for the benefit of the public, and for that purpose may provide that the person who first in good faith commences the erection of a mill and dam, if not subject to the restrictions named in the act, shall have the right to complete the same upon paying all damages assessed. This power has been exercised in some of the states from an early period in our history.

In 1713 an act was passed in Massachusetts authorizing

the erection of dams for propelling corn and saw mills, and providing compensation to persons sustaining injury by the erection of such dams. This statute was substantially renewed in 1796, and with some modifications was continued in the Revised Statutes of 1836. Like provisions have been adopted in a number of the other states, and seem to have been sustained.

This right, as is said in *French v. Braintree Manf'g Co.*, 23 Pick., 220, is "granted for the better use of the water power, upon considerations of public policy and the general good, with a view to keeping up and maintaining mills for use, which is deemed for the public good; and the right must be considered as incident and subservient to this purpose, as attached to mills for use and not as attached to the land merely."

It will be seen that under our statute, water grist mills are subject to regulation by the legislature, and the rates of tolls subject to its discretion—are in fact mills for the use of the public. But it is said that the words "to aid in the construction of any railroads, or other work of internal improvement," in the act of 1869, restrict the aid to be given to railroads, and works of like character, such as canals, turnpikes, and bridges.

The word "improvement" is defined as follows: "An amelioration in the condition of real or personal property effected by the expenditure of labor or money for the purpose of rendering it useful for other purposes than those for which it was originally used, or more useful for the same purposes." 1 Bouv. Law Dict., 589.

The phrase "internal improvements" is applied to improvements of highways, channels of travel and commerce, etc. *U. P. R. v. Commissioners*, 4 Neb., 456.

The test for determining the character of an improvement of this kind is the use for which it is designed. If it is for public use, subject to the control and regulation of the legislature, it would seem to come within the meaning of

the words "internal improvements." Besides, the language of the statute will not admit of the construction contended for without adding thereto the word "like" or a word of similar import. No court would be justified in thus importing a word into a statute when its meaning was plain and unambiguous, and we must hold that there is no such restriction in the act above referred to. The mill in this case is said to be propelled by water drawn from the Platte river, and is for the use of all who may desire to patronize it, at such rates of toll as may be prescribed by the county commissioners of Merrick county.

And in our opinion it is a work of internal improvement within the meaning of the act. See *Guernsey v. Burlington Tp.*, 4 Dillon, 375. *Township of Burlington v. Beasley*, 94 U. S., 313. In the case last cited, it is said: "It would require great nicety of reasoning to give a definition of the expression 'internal improvements,' which would include a grist mill run by water, and exclude one run by steam; or which would show that the means of transportation were more valuable to the people of Kansas than the means of obtaining bread." The Kansas statute of 1868 declares all water, steam, or other mills, whose owners or occupiers grind for toll or pay, public mills. In our view, there is a clear distinction between aiding the development of the water power of the state, a power which is continuing in its nature, and may be used without cost or expense, and must be used at certain points on a stream where a dam can be erected and power obtained, and a mill propelled by steam that must be attended with a continuous cost for fuel, and may at any time be removed to another locality.

It is very clear that justice has been done, and the judgment is affirmed.

JUDGMENT AFFIRMED.

COBB, J., dissented.