WILLIAM B. LUCAS ET AL., APPELLANTS, V. ASHLAND LIGHT, MILL & POWER COMPANY, APPELLEE.

FILED NOVEMBER 27, 1912. No. 16,347.

1. **Statutes:** TITLE OF ACT: MILLS. The title of the act of 1873 (Gen. St. 1873, ch. 44, Comp. St. 1911, ch. 57), "An act relating to mills and milldams," is sufficiently broad to admit of legislation in regard to mills of all kinds that are of public utility and having "machinery to be propelled by water."

2. **Quaere.** Whether the provisions of that act extend to mills such as "saw, carding, or fulling mills," when wholly private in their nature, *quære.*

3. **Eminent Domain:** PUBLIC UTILITIES: QUESTION FOR LEGISLATURE. Whether an undertaking is for the benefit of the people at large, and should be regarded as of public utility, must necessarily be largely within the discretion of the legislature to determine, and, unless it is clearly private in its nature, the court will not interfere with this legislative discretion.

4. ———: ———: WATER POWER. The use of water power to generate electricity to supply a city and its inhabitants with light and power is a public use, and the act should be construed to apply in such case.

5. ———: ———: CHANGE OF USE. When the right of flowage of private lands has been acquired under the *ad quod damnum* act for a public purpose, if the use of that right is changed to an entirely different and private purpose, it will amount to an abandonment of the right, but a change from one public use to another, which is within the purview of the act, will not amount to an abandonment of the right.

6. ———: FLOWAGE: REMEDIES OF LANDOWNERS. Owners of riparian lands which are injured by flowage, and were not included in the original *ad quod damnum* proceedings, may proceed under section 14 of the act. Gen. St. 1873, ch. 44. After the dam has been built at great expense and the mill has been in operation for many years, they cannot maintain an action in equity to abate the dam as a nuisance, or to restrain the use thereof until their alleged damages are adjusted.

7. ———: ———: ———: DAMAGES. In an action in equity by the owners of riparian lands to enjoin the use of the water power and remove the dam as a nuisance, and for general equitable relief, the trial court should adjust the rights of the several parties, and, if the injunction is refused, should allow plaintiffs such damages as they are entitled to.

8. ———: ———: ———: ———. In such action, plaintiffs whose lands were not included in the original *ad quod damnum* proceedings should be allowed such damages as are caused by maintaining the dam; and those whose lands were included in the original proceedings should be allowed such damages, if any, as the new and additional use of the dam and power cause to their lands over and above the damage caused by the dam and the use thereof, as allowed in the original proceedings.

APPEAL from the district court for Saunders county: GEORGE F. CORCORAN, JUDGE. *Affirmed in part and reversed in part.*

*John J. Sullivan* and *Louis Lightner,* for appellants.

*Hainer & Smith, G. W. Simpson* and *H. Gilkeson, contra.*

SEDGWICK, J.

In 1873 Oscar M. Carter prosecuted proceedings in *ad quod damnum* in the district court for Saunders county, and in the following year obtained a judgment in that action, establishing his right to erect and maintain a dam across Wahoo creek on certain lands then owned by him near the town of Ashland, in said county. This dam by the judgment was not to be maintained more than 15 feet high above low-water mark, and damages were allowed to the owners of certain riparian lands which it was found would be injured by raising the water to that height. This defendant succeeds to these rights by mesne conveyances. The petition in *ad quod damnum* showed that the "petitioner is erecting a grist mill on his said land, and is constructing a dam across said Wahoo creek, * * * and is excavating a mill-race for his said mill," and prayed "that he might have leave to proceed to the construction of his said improvements." The order of the court recited that the petitioner had asked "for leave to build and continue his milldam at the point described in his said petition." The jury by their verdict found that "by reason of construction and continuance of the milldam built 15 feet high above low-water mark (the defendants, naming

them, would be damaged in certain amounts specified), and that the said flouring mill erected by the plaint'ffs will be of public utility." This verdict was approved by the court, and it was ordered, among other things, that "the plaintiff be and is hereby authorized to build and continue his said mill and milldam as prayed in his said petition." Mr. Carter thereupon built a small mill and erected a dam, and afterwards other dams which appear to have been unsubstantial and of a temporary nature. In 1889 a substantial dam was begun, which was completed in the following year. This dam was built at considerable expense. Many car-loads of rock were used, and this dam has continued in service and has proved to be a substantial and suitable structure. Prior to the erection of this dam, it would seem that the power had been used principally, if not entirely, for grinding grain. In 1890 electrical machinery was installed, and the power was used for furnishing electric lights for the city of Ashland and its inhabitants. In May, 1907, the mill and a large part of the machinery were destroyed by fire, and the owners of the property immediately rebuilt the building and power-house and installed new machinery therein. Since that time the power has been used for generating electricity for the city of Ashland and its inhabitants.

In December, 1907, these plaintiffs began this action in the district court for Saunders county, alleging that they were owners of riparian lands damaged by the maintenance of the defendant's dam, and asking that the dam be "adjudged to be unlawful and a nuisance, and that it be abated and the defendant perpetually enjoined from maintaining it or any other dam on Wahoo creek, whereby said lands or any of them may be flooded," and for general equitable relief.

The plaintiffs also alleged that the dam was being maintained at a greater height than allowed by the *ad quod damnum* proceedings, and asked for an injunction restraining the defendant from so maintaining the dam. A temporary restraining order was issued restraining the de-

fendant from raising or maintaining the dam above the top of the solid masonry thereof by means of flash-boards, or otherwise. The defendant answered, alleging special matters in defense, which will be stated, so far as may be necessary, in the discussion of the questions of law and fact presented in the briefs. Upon the trial the court found generally in favor of the defendant and dismissed the plaintiffs' proceedings. The plaintiffs have appealed.

The plaintiffs insist that the dam is not now being devoted to a public use, and that "an easement for a particular purpose ceases when the purpose no longer exists," and that, "in any event, the dam can only be maintained 15 feet above actual low-water mark;" that the dam has been substantially raised above the prescribed limits by use of "flash-boards," which in effect added something like two feet of height to the dam. It is also insisted that some of the plaintiffs in this case are the owners of riparian lands which were not included in the *ad quod damnum* proceedings, and which are injured by this dam, and that such plaintiffs are entitled to relief, although others are not found to be so. The case is an important one, and some of the difficult questions presented are without precedent in this state. A reargument was allowed, and we have had the assistance of a thorough and able presentation of the case from both points of view.

1. The principal discussion has been in regard to the nature of the rights conferred in *ad quod damnum* proceedings, and in that connection, also, in regard to the limitations placed upon the legislature by the constitution. The constitution has placed certain limitations upon each of the three departments of government. Whether an attempted act of legislation is beyond its power is a question of law. The constitution makes it the duty of this court to determine questions of law that arise in litigation before it, and, when an act of the legislature is drawn in question as beyond its power, we cannot avoid the determination of the question so presented.

The courts have, no doubt, in some instances interfered

unjustifiably with legislation. This power should be carefully guarded and judiciously used, avoiding any tendency to restrict legislation to the limits that the judges think are beneficial and desirable. This, of course, the courts have no power to do. In all questions of doubt, the legislature should determine the matter. When there is substantial and reasonable doubt, the act of the legislature must be upheld. Two objections are urged against the constitutionality of the act. The first is that the title of the act. is not broad enough to admit of legislation concerning "machinery to be propelled by water," and that, therefore, that clause in the first section of the act has no force. The title of the act is "An act relating to mills and milldams." Gen. St. 1873, ch. 44. If we consider the word "mill" in its original and first meaning, there is no doubt that it would not include "machinery to be propelled by water," unless that machinery was to be used in grinding; the word "mill" originally meaning to grind or make fine. This word has, however, been used for many years and has now acquired a variety of uses. Webster's Unabridged Dictionary, after defining the word "mill," uses this language: "In modern uses the term mill includes various other machines or combinations of machinery * * * to some of which the term manufactory or factory is also applied." And in the New International Directory this statement is changed, and the fifth definition of the word "mill" is: "A building or collection of buildings with machinery by which the processes of manufacturing are carried on." The Standard Dictionary gives, among others, the following definitions: "(2) Any one of various kinds of machines that transform raw material by other processes than grinding into some other form; as, a sawmill; planing-mill. * * * (5) An establishment for reducing ores by a process other than smelting. An ironworks where the metal in the cruder forms is converted into merchant iron. (6) A building fitted up with the machinery requisite for a factory; as, a cotton-mill; woolen-mill. * * * (10) (Slang.) A pugilistic com-

bat; set-to." And it is stated that "mills are named from their action on the substance operated upon, and from the material or substance that they operate upon or prepare for use"—citing between 40 and 50 kinds of mills.

In Colorado their constitution provides that private property may be taken for private use without the consent of the owner "for private ways of necessity, and * * * for reservoirs, drains, flumes or ditches, on or across the lands of others, for agriculture, mining, milling, domestic, or sanitary purposes," and the supreme court of that state held that, under this provision of the constitution, land could be condemned to carry water to operate an electric light plant. The court held: "The term 'milling,' as used in the constitution, is synonymous with the word 'manufacturing,' and an electric light plant is a manufacturing establishment." *Lamborn v. Bell*, 32 Pac. 989 (18 Colo. 346). Our constitutional provision, that the subject of legislation must be expressed in the title of the act, is supposed to be to prevent inserting foreign matters in pending bills, and so securing ill-considered legislation. "An act relating to mills and milldams" is a comprehensive title. It permits of legislation regarding any kind of mill that uses "machinery to be propelled by water." We think this objection cannot be sustained.

The second constitutional objection which the plaintiffs urge against the construction of the statute contended for by the defendant is that the legislature has no power to condemn private property for private use. The *ad quod damnum* act involves the exercise of the right of eminent domain, and it is contended that to generate electricity to be furnished to a city and its inhabitants is not a public use, and beyond the power of the legislature to authorize the damaging of private property for such purpose, and therefore to make such use of the right obtained by *ad quod damnum* is to abandon the right which was originally given and was within the power of the legislature. The Massachusetts court, construing the statutes of that state, appear to have held that the provisions of the milldam act

extend to mills for mechanical and manufacturing purposes as well as to those intended to serve the public for a stipulated toll, and this appears not to violate the fourteenth amendment of the federal constitution. *Otis Co. v. Ludlow Mfg. Co.*, 201 U. S. 140. We do not find it necessary to determine or discuss this question.

Is the use that is being made of this power a public use? There is an interesting discussion of this question in 3 Farnham, Waters and Water Rights. The author severely criticises the decisions of several courts, and especially the supreme court of Massachusetts. He does not agree with that court in upholding the constitutionality of acts which allow the flowage of lands for the purpose of constructing private mills, and says: "The only things that will justify such a taking is the intention to use the power for the direct benefit of the public, as by the erection and operation of a public mill, where every one will have a right to have his work done upon payment of a toll, and which will always be under control of the legislature." Section 697. In discussing the question how far a water power can be taken under the power of eminent domain for the purpose of generating electricty, this author says: "If the electricity generated is to be subject to the common use of all who apply for it upon making reasonable compensation, it is more nearly a public use than is any other connected with the generation of power." Section 697b. The supreme court of Minnesota has decided that "the generation of electricity by water power for distribution and sale to the general public on equal terms, subject to governmental control, is a public enterprise, and property so used is devoted to public use." *Minnesota Canal & Power Co. v. Koochiching Co.*, 97 Minn. 429, 5 L. R. A. n. s. 638. It was said by the supreme court of Vermont, in *In re Barre Water Co.*, 62 Vt. 27, 20 Atl. 109: "But to say what a public use is with sufficient comprehensiveness and accuracy to meet the exigencies of all cases is, to say the least, difficult. Nor is it easier to define the limit of legislative power in respect to the right of eminent domain. This power

must have some degree of elasticity, that it may be exercised to meet the demands of new conditions and improvements, and the ever varying and constantly increasing necessities of an advancing civilization. The circumstances and requirements of the particular case, and the practice of other states and governments where constitutional limitation is placed on legislative action in this respect must be our guides in determining what is and what is not a public use. It is sometimes easier to say what is not than to say what is." In *Traver v. Merrick County*, 14 Neb. 327, this court quoted from the Massachusetts statute and the decisions of that court, apparently with approval, and it was held that bonds given in aid of a water mill were valid. It appears from the syllabus in the case, and perhaps from some of the expressions in the opinion, that the mill in question was a public mill, intended to grind for toll, but this is not treated in the opinion as necessarily a controlling matter. The case has been cited by text-writers as following the Massachusetts rule. 15 Cyc. 598. In the later case of *Getchell v. Benton*, 30 Neb. 870, it is held that a beet sugar manufactory, which does not manufacture sugar from beets for toll, although propelled by water power, is not within legislative control by virtue of any law of this state, and is not a work of internal improvement. The opinion seems to put this holding upon the ground that it is not a work of public utility. Whether an undertaking is for the benefit of the people at large, and is so general in its nature that it should be regarded as a public utility, must necessarily be within the discretion of the legislature to determine, and, unless it is clearly private in its nature, the courts will not interfere with this legislative discretion. Under such circumstances, it becomes a question of ascertaining the intention of the lawmakers.

The evidence shows that this defendant is using this power to furnish the city of Ashland and its inhabitants with electricity for lighting and power purposes. It was organized for that purpose. The law requires it to furnish

all applicants upon equal terms. Its business, including its rates, are subject to legislative regulation. This would seem to be a public use.

2. It is contended that the statute cannot be construed to authorize this use of the right obtained by *ad quod damnum* proceedings. The language of the first section of the act is a sufficient answer to this objection. "If any person, desiring to erect a dam across any water-course for the purpose of building a water grist, saw, carding, or fulling mill, or of erecting any machinery to be propelled by water, * * * he may file a petition," etc. Comp. St. 1911, ch. 57, sec. 1. The last legislature enacted a statute providing that cities and villages can acquire milldam sites for municipal purposes. Laws 1911, ch. 83. This is a legislative construction that such use of the power is a public use, and clearly contemplates that rights of flowage acquired by *ad quod damnum* proceedings may be used for such purposes. Unless this is true, the act in its most common application would be unconstitutional.

3. It is said that "an easement for a particular purpose ceases when the purpose no longer exists," and *Gross v. Jones*, 85 Neb. 77, is cited as supporting this proposition. In that case the principal question determined was whether the dam and the power generated thereby had been abandoned. It is assumed in the opinion that to maintain the dam and mill-pond for the purpose of furnishing ice would not be such a use of the right acquired as to prevent the loss of the right by abandonment for nonuser. It may be conceded that, having obtained the right of flowage of these lands for a specified public purpose, it cannot be devoted to an entirely different and private purpose, and an attempt to do so would be an abandonment of the right obtained. The question is: What must be regarded as a different purpose within the meaning of this rule? In *Chicago & E. I. R. Co. v. Clapp*, 66 N. E. 223 (201 Ill. 418), the supreme court of that state held: "Where a railroad company has ceased to operate a branch to a coal mine after the mine was exhausted, had taken up the tracks

and nearly all the ties, removed all the crossing signs and all the cattle guards but two or three, taken out the switch ties and bridge timbers, allowed the right of way to grow up with weeds, and failed to keep the fences in repair, it was proper to submit to the jury whether there was an intention on its part to abandon the branch." And the court in the opinion stated the law as follows: "When a corporation, in the exercise of the right of eminent domain, acquires for a public purpose a mere easement in land, its right and title to the property so acquired are dependent upon the use of the property for public purposes, and when such public use becomes impossible, or is abandoned, its right to hold the land ceases, and the property reverts to its original owner." There must be necessarily some substantial basis upon which to determine the character of the purpose for which the right is used. The right obtained in this case was to raise the dam to a given height for milling purposes. A change from the exclusive grinding of wheat into flour to the grinding of corn, barley, and other grains might be in some sense applying the power to a different purpose, but clearly not within the meaning of the limitation that we are considering. One who objected to such a change of the purpose to which the power was applied should suggest some substantial basis for such a distinction. *Hathaway v. Mitchell,* 34 Mich. 164. See, also, note, 67 L. R. A. 390. We have seen that the legislature has in the most solemn form authorized the application of rights so acquired to municipal purposes. The change is from one public use to another, and not a change from a public to a private use. The present use of the power is not such a change from that authorized by the *ad quod damnum* proceedings as to amount to an abandonment and justify the destruction of the property. The owners of property included in the *ad quod damnum* proceedings should be allowed to recover from defendant all damages which their property has sustained by the new use of the water power, if any, over and above the damages caused by the use authorized by the *ad quod damnum* proceedings.

4. It is urged that some of these plaintiffs were not parties to the *ad quod damnum* proceedings, and their lands which are injuriously affected by the flowage were not included in those proceedings, and that the trial court therefore erred in not granting such plaintiffs any relief. The fourteenth section of the act authorizes any one whose land is overflowed or injured by the maintenance of a milldam to begin proceedings under the act. Perhaps, the court intended to indicate in *Kyner v. Upstill,* 29 Neb. 768, that he might maintain an action for damages. This would seem to be in harmony with the holdings in *Chicago, B. & Q. R. Co. v. Englehart,* 57 Neb. 444, *Blakeley v. Chicago, K. & N. R. Co.,* 25 Neb. 207, and *Bronson v. Albion Telephone Co.,* 67 Neb. 111. He could not maintain an action to enjoin the use of the dam, and abate the same as a nuisance, after so long acquiescence under the circumstances in this case. If lands not included in the *ad quod damnum* proceedings are damaged by defendant's dam and the use thereof, the owners of such land should be allowed to recover such damages.

5. The plaintiffs contend that the evidence establishes that the defendant's dam is more than 15 feet above low-water mark, and that the use of flash-boards raises the water to a greater height than is permitted by the rights obtained by the defendant's grantors. They do not attempt any analysis of the evidence, but they allege that the defendant's recital of the evidence upon these points is incomplete and unfair. A large number of witnesses were examined, and the bill of exceptions is quite bulky, presenting some conflict in the testimony. It does not seem advisable to enter upon a discussion of this evidence. It seems to support the conclusions reached by the trial court. The contention of the defendant that the plaintiffs and all parties interested have consented to the use of these flash-boards, and so are now estopped to complain, does not seem to be quite consistent with the position that the defendant has taken in urging that the use of these flash-boards has not raised the water above the prescribed limit.

The defendant does not seem to be in a position to insist upon any greater rights than those acquired through the *ad quod damnum* proceedings. The judgment in this case is without prejudice to a future action, if it should be found that the defendant is exceeding those rights.

The writer would have affirmed the judgment of the trial court as rendered, but upon consultation we concluded that the trial court, having jurisdiction of the matter, should have retained the action for all purposes, and should have allowed the plaintiffs whose lands were not included in the *ad quod damnum* proceedings to recover their damages, and the plaintiffs whose lands were included in the *ad quod damnum* proceedings to recover such damages, if any, to the lands as were caused by the new and additional use of the dam and water power.

The judgment of the district court dissolving the injunction is affirmed, and the judgment is in other respects modified, and the cause remanded to the district court, with instructions to allow the parties to amend their pleadings, if so advised, and take further evidence, if necessary, and determine the plaintiffs' damages as indicated in this opinion.

JUDGMENT ACCORDINGLY.

REESE, C. J., not sitting.

LETTON, J.

I concur in the opinion, subject to the principles of law announced in *Znamanacek v. Jelinek*, 69 Neb. 110, and *Arterburn v. Beard*, 86 Neb. 733.

HAMER, J., concurring.

I agree in the conclusion reached by Judge SEDGWICK that the dam should not be destroyed, but I only partly agree to the things said in the main opinion, and I wish to give my understanding of what I conceive to be the principle which should be applied.

Flour may be manufactured by an aggregation of capital applied to the development of water power and ma-

chinery. A private person may not manufacture flour for his own use because of lack of capital and lack of machinery. The manufacture of flour by private persons or corporations for commercial purposes would seem to be a private use for a public purpose. When each person who comes to mill pays for his grinding by a toll taken from the grist the mill is then a grist-mill. This was the old method. It has been in a very large degree, perhaps entirely, superseded by the method of barter and exchange; that is, the man who comes to mill brings a load of wheat and takes away a certain amount of flour which he receives in exchange for the wheat. This would seem to be the method in vogue at the present time. We have outgrown the ways of our grandfathers, and, according to the standard which existed in earlier times, the flouring mill of today is a commercial enterprise for a commercial use in which the public is interested because the public demands that the flour shall be manufactured and placed upon the market where it may be purchased for the general use of the people, as nearly everybody uses flour.

The thing that justifies the taking of the land and submerging it by water is the creation of a water power to be used in the interest of the public in the conduct of an enterprise to manufacture flour. The mill is for the benefit of the public, and it matters not if the old method of taking tolls out of the grists has been superseded by the new method of exchanging so many bushels of wheat for so many sacks of flour. When the wheat is exchanged for the flour, that is a matter in which the public is interested, although the actual grinding of the flour is a private enterprise conducted by the miller. It is a public utility because it is a necessity to the public, and the creation and maintenance of the power which creates the flour in order that the public may purchase it is clearly a public utility. The actual manufacturing of the flour is a private enterprise, although the flour when manufactured is for the public use. Is there any serious distinction between the manufacture of flour for the use of the public and the

generation of electricity for the use of the public? Do we deceive ourselves with words when we call the manufacture of flour for the public a private enterprise because it is conducted by private capital? And is the generation of electricity by private capital for public use forbidden because the capital used in developing electricity is private capital? Is it the way the thing is manufactured that determines whether it is for the public use and whether the business is a public utility, or is it the necessity of the thing that is manufactured for the public? May it not be said that, because the public demand the use of the flour and also demand the use of electricity, the manufacture of the flour and the generation of the electricity are both public utilities. In Massachusetts all sorts of mills are treated as public utilities. The rule adopted in Massachusetts consults the welfare and benefit of the public. The mill-streams are there lined with cotton factories, woolen factories, and shoe factories, and, while these enterprises are conducted by private capital, the right to dam up the streams and to utilize the power in these various manufactories is for the betterment of the whole people. These occupations give employment to thousands of people. They permit the investment of millions of dollars. These enterprises are held to be public utilities because of the great public interest in them and because of the great public benefit received by the people.

Section 13 of the Bill of Rights of the constitution of 1866: "The property of no person shall be taken for public use without just compensation therefor." The foregoing declaration of rights was in force when the property in question was taken. The constitution itself does not specify a particular use, as the manufacture of flour alone or corn-meal or feed or lumber, but it is just the taking of the property for "public use." The provision of the constitution of 1866 was followed by section 21 of the Bill of Rights in the constitution of 1875, and that section contemplates the taking or damaging of property for "public use," and it does not provide that after the prop-

erty is taken for public use it shall be used for any special purpose. Chapter 57, Comp. St. 1911, contains the original section as it is now amended. This section contemplates erecting "a dam across any water-course for the purpose of building a water grist, saw, carding, or fulling mill, or of erecting any machinery to be propelled by water." Section 1. The section appears to have been intended to cover the things known when the act was passed, and then, seemingly as an afterthought, there is added "erecting any machinery to be propelled by water." I am unable to conceive of language broader than that employed in the section, and there is seemingly nothing in the constitutions of 1866 and 1875 to forbid the use of the language employed. It is apparent from this language that the makers of the constitution intended to compel the payment to the private owner of the amount of his damages before the property could be taken for public use. As that has been done once and the property has actually been taken for public use, is there any reason why there should be a second payment when the private owner has been paid once for the taking of his property? Is not that enough? To meet the new conditions of advancing civilization, should the courts say that the narrowest possible construction should be put upon the language used, and that the legislature intended that the power once acquired could only be used for the least number of purposes to which it might be applied? Is it not better that the courts should be liberal in the construction of statutes like this? Is it not better that there should be a degree of elasticity in limiting the legislative power in respect to the right of eminent domain? Section 15, ch. 57, Comp. St. 1911, contemplates the bringing of a petition to obtain leave to build a mill or milldam. By this language it would seem that the legislature intended that there might be either a mill or milldam, or both. Milldam would seem to be a general term by the construction of which power is obtained and not necessarily to run any particular kind of mill. Section 24 of the same act seems to contemplate a

"milldam belonging to any mill or machinery." It authorizes the owner of the mill to enter upon lands contiguous for the purpose of repairing embankments to prevent the water from breaking through in case of flood. Section 27 of the same act makes those mills which grind for toll public mills. Section 33 of the same chapter provides for changing a public mill into a private mill. This may be done by posting a notice on the mill and in two other conspicuous places within the county, and by reimbursing those people who have assisted in the erection of the public mill. It is not, however, contemplated that because the mill becomes a private mill the milldam shall be abandoned or destroyed.

It will be seen by this that the legislature did not contemplate the exclusive application of the power to a mill grinding for toll. Putting it the other way, the legislature contemplated the *ad quod damnum* proceedings and the payment of damages and the use of the power obtained for the running of a private mill. It is undoubtedly a public utility to build a dam and a mill for the manufacture of flour. To build such a mill and to manufacture flour is a private enterprise conducted with a public purpose. It may be a private enterprise to generate electricity for the use of the public with which the public may light its streets and buildings. Is the use of the power to manufacture flour more a private enterprise than the use of the power to generate electricity? By virtue of the *ad quod damnum* proceedings, the plaintiffs in this case sold to the original proprietors the right to flow their lands. Their lands were originally overflowed for the purpose of furnishing power to run the mill. The thing that the plaintiffs parted with was the right of the petitioner in the *ad quod damnum* proceedings to overflow their lands along the creek in consideration of the money which he paid to them for that privilege. They have been paid once. Can it be of any serious moment to them whether their lands are overflowed for the purpose of furnishing power to a mill that grinds flour which the public purchase and

use, or a mill or machinery that provides something else which the public need and purchase and use? The people who own these lands agreed that their lands might be submerged, and they were submerged. They are only submerged yet.

It is contended, with ingenuity and force, that only the things can be done which were in contemplation of the original jury that sat in the *ad quod damnum* proceedings. The theory is that there can be no growth or change. The theory is that it must be a "grist-mill," and that it cannot be anything else. It would hardly seem that this contention is fair in view of the provisions of the constitution and in view of the provisions of the statute. The words used, "erecting any machinery to be propelled by water," certainly suggest that it was, in contemplation of the legislature that something else might be done in addition to running a flour-mill. If this be not so, then is there any purpose in using the words "erecting any machinery to be propelled by water"? If the right was granted for the purpose of using power, what difference can it make to the grantors whether the power is applied to one purpose or another? They have consented that the water may be backed up the stream, and that their lands may be submerged so that the power may be created. What difference can it make to them whether the power is applied to one legitimate purpose or another? They have recognized the principle that the power may be created and applied. When the power is created and has been applied, why should they seek to destroy it?

In view of the able opinion delivered by Judge SEDGWICK, I hesitate to write anything in addition, and I only do so because of the fact that the main opinion does not seem to me to fully give the reasons which I believe should be given to justify the conclusion reached.

ROSE, J., dissenting.

As I see the merits of this case, the affirmance of that part of the lower court's decree denying an injunction to

prevent defendant from overflowing the lands of plaintiffs deprives them of constitutional rights and leaves portions of their real estate in control of a trespasser. Entertaining this view, I am compelled to dissent. In giving the reasons by which I am guided, I prefer to state in my own way what I find in the record and the questions presented for determination.

The relief sought by plaintiffs is a perpetual injunction to prevent the maintaining of a dam across Wahoo creek near Ashland. They are upper riparian proprietors whose lands are damaged by overflowing water. Defendant is a corporation. It maintains the dam and uses the water-power of the stream to generate electricity for lighting purposes in the city of Ashland, Nebraska, and in Pacific Junction, Iowa. The trial court dismissed the case after a trial on the merits, and plaintiffs appealed to this court for the equitable relief denied below.

One of the grounds urged by plaintiffs for an injunction may be stated in this form: Defendant never had any right to maintain the dam except for the purpose of operating a grist-mill; that right has been lost by abandonment or nonuser, and defendant is unlawfully overflowing the lands of plaintiffs for the purpose of running an electric light plant. On the other hand, defendant, through an easement of flowage acquired by condemnation, asserts the right to use the water-power to propel the machinery installed in its power-house. In determining the merits of these contentions, the privilege under which defendant assumes to act must be traced to its source. By a judgment rendered May 26, 1874, in *ad quod damnum* proceedings in the district court for Saunders county, Oscar M. Carter was authorized to construct and maintain a dam on the present site, and he promptly exercised the right thus granted. It is stipulated by the parties that defendant, through mesne conveyances, succeeded to the rights of Carter. On the face of his petition in the condemnation proceeding, the enterprise originally undertaken, in addition to the construction and maintenance of the dam, was

the operation of a "grist-mill." In performing their duties the jury, selected under the writ of *ad quod damnum*, among other things, found: "Said 'flouring-mill' erected by the plaintiff will be of public utility." And it was adjudged by the court: "That the plaintiff be and is hereby authorized to build and continue his said mill and mill-dam as prayed in his said petition." On the right thus acquired defendant attempted to justify the overflowing of plaintiffs' lands to generate electricity for lighting purposes alone. Is that position tenable? A finding by a jury that the mill will be of public utility is by statute made an essential part of the proceeding to condemn lands under the act of 1873. The finding of the jury was limited to the public utility of a flouring-mill, and the decree of the court in the *ad quod damnum* proceeding went no further. Is defendant now lawfully exercising the original easement of flowage? Since 1896 no flour has been manufactured, and one of defendant's officers admitted on the witness stand that the establishment could not during that period be considered a "flouring-mill." The original building was old and dilapidated in 1904. During the fall of that year and the ensuing year it was torn down and the flouring machinery removed. The old structure was replaced by a power-house in which electrical machinery for a lighting plant was installed. The flouring machinery was nearly all sold and there was no attempt to replace it. A corn-burr, however, was retained, and there is convincing proof that defendant intended to use it for the purpose of preserving the original easement of flowage, instead of operating a grist-mill in good faith. The remaining operations of the grist-mill, so far as disclosed, consisted of grinding a sack of grain for one customer, five or ten bushels for another, and a car-load for the owner of the mill. The plant was destroyed by fire May 8, 1907, and since that date no grain of any kind has been ground, nor has defendant installed any machinery for that purpose. The electric power-house, however, was promptly restored and equipped for the utiliza-

tion of both steam and water-power. The truth of the record is that electric lighting is the soul of defendant's enterprise. To that business it has devoted its capital and energy. Neglect, nonuser and abandonment of the milling enterprise, for which alone the right of flowage was established, are shown with equal certainty. It abandoned its grist-mill and lost the incidental easement of flowage.

It is settled law in this state that the condemnation did not vest in Carter or in his grantee the right of flow-age in perpetuity. What he procured was the mere privilege of exercising his easement during its existence. *Gross v. Jones*, 85 Neb. 77. The original easement of flowage for grist-mill purposes, therefore, cannot be successfully interposed as a defense to the action of plaintiffs to enjoin defendant from overflowing their lands for the sole purpose of utilizing the water-power for an electric light plant. After abandonment of the particular use for which a mere easement in land is established, it cannot be lawfuly devoted to a different purpose without payment of additional compensation or recondemnation. *Heard v. City of Brooklyn*, 60 N. Y. 242; *Campbell v. City of Kansas*, 102 Mo. 326; *Pittsburgh & L. E. R. Co. v. Bruce*, 102 Pa. St. 23. Having lost the original easement by abandonment and nonuser, having made no effort to condemn the lands of plaintiffs for the new and different purpose of obtaining water-power to generate electricity, and having failed to pay for, or otherwise acquire, an additional right of servitude, defendant is a trespasser, and should be enjoined as such.

The deduction I make from the facts and the law cannot be avoided by merely pointing to the milldam act of 1873 and asserting that its title is broad enough to include legislation relating to the procuring of easements of flowage for the purpose of generating electricity by water-power, that the purpose named is a public one, and that the act authorizes such easements. If the title is as broad as the description of the majority, and if the act contains

provisions for the condemnation of land for an easement of flowage for the purpose of generating electricity by water-power, defendant is still a trespasser for the following reasons: It abandoned the mill and lost its incidental right of flowage. It did not in a new *ad quod damnum* proceeding under the act of 1873, or in any other manner, acquire the right to use plaintiffs' lands for electric lighting purposes. It did not pay for such different and additional use. No jury ever found, as required by the milldam act, that the new enterprise is a public utility. No court ever so held in an *ad quod damnum* proceeding. The original judgment rendered in 1874 did not extend to the new enterprise. Damages therefor were never estimated or paid. The lighting of cities by electricity was unknown in 1873, when the milldam act was passed. An easement of flowage to supply an electrical plant with power was not at that time in the mind of the legislature, or of the jury, or of the court, or of the parties. In the *ad quod damnum* proceeding, therefore, Carter acquired no electric lighting easement. The method of appropriating private property for a public purpose is defined by statute. There is no pretense that defendant pursued the statutory method after it lost its original easement. If defendant had a right under the act of 1873 to acquire a new easement applicable to the new use, without the consent of plaintiffs, that right has never been exercised. Since defendant never acquired an electric-lighting easement under the milldam act, I decline to express an opinion on the breadth of its title or on the scope of its provisions.

I do not find in the record any substantial proof of the acquiescence suggested by the majority as a reason for denying equitable relief. The power-house and other improvements were constructed on land to which defendant owned the fee. The power-plant is equipped to utilize both water-power and steam-power. By the latter the lighting enterprise can be carried on without the right of flowage. Improvements for utilizing steam-power did not concern

plaintiffs. As long as the grist-mill was operated in good faith, plaintiffs were not injured by the maintenance of the dam at the lawful height. Defendant at all times claimed the right to maintain the dam under the original easement. It now asserts that right in this court. It kept a corn-burr for the ostensible purpose of exercising its grist-mill easement, while its real business was electric lighting. Under the circumstances of this case, plaintiffs should not be deprived of their property because they did not discover, at an earlier date, contrary to the continuous assertions of defendant, that the grist-mill had been abandoned. If I apprehend the import of the majority opinion, cases are cited to sustain the proposition that a chancellor should not inconvenience the public or interfere with a public utility by granting an injunction which would interrupt public service. It may be conceded that a landowner who knowingly permits a railroad company to build and operate a highway on his land, or a telephone or telegraph company to proceed under like circumstances, is sometimes limited to the remedy for damages. That rule, however, has no application here. Defendant's power-house is equipped to utilize as much steam-power as water-power. The granting of an injunction would not interfere with the public service, but would permit plaintiffs to control their own property until such a time as defendant acquires by lawful means the easement it now exercises in violation of law.

FAWCETT, J., concurs in the dissenting opinion.