Henry L. HOWARD, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

No. 09–575L.

United States Court of Federal Claims.

Aug. 16, 2012.

---

J. Robert Sears, Baker, Sterchi Cowden & Rice, L.L.C., St. Louis, Mo., for the plaintiffs. With him were Steven M. Wald, Thomas S. Steward, and Elizabeth G. McCully, Baker, Sterchi Cowden & Rice, L.L.C., St. Louis, Mo.

Lary C. Larson, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendant. With him was Ignacia S. More-no, Assistant Attorney General, Environment and National Resources Division.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The plaintiffs, who claim property interests along a rail line in Cass and Pulaski Counties, in Indiana, filed a complaint in the United States Court of Federal Claims alleging that the government caused uncompensated takings of their property interests pursuant to the Fifth Amendment to the United States Constitution. The plaintiffs premise their claim on the on the United States Department of Transportation Surface Transportation Board's (STB) issuance of a Notice of Interim Trail Use (NITU) pursuant to the National Trails System Act (Trails Act), 16 U.S.C. §§ 1241–51 (2006), which authorized the conversion of railroad easement rights-of-way, which run through plaintiffs' properties from rail use to trail use.

The rail line at issue was originally constructed in the late 1800s and early 1900s by a number of railroad companies, including the Chicago, St. Louis & Pittsburgh Railroad Company, the Columbus Chicago & Indiana Central Railway Company, and the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company. The portion of the rail line rights-of-way subject to the NITU at issue in the above captioned case extends 21 miles between milepost 0.0,[1] near Kenneth, Indiana, in Cass County, and milepost 21.0W, near Winamac, Indiana, in Pulaski County. The rail line once formed part of the main line of The Pennsylvania Railroad Company, but was transferred to the Consolidated Rail Corporation in 1976. The Consolidated Rail Corporation sold the rail line to the Winamac Southern Railway Company in 1993. In 1995, the Winamac Southern Railway Company sold the rail line to A & R Line, Inc. (A

---

1. According to the joint stipulation of facts, "[t]he Parties acknowledge that there have been two mileposts given by the railroad for an end point—5.1W and, through a corrected filing, 0.0. The Parties stipulate that regardless of the actual milepost designation, the southernmost point covered by the NITU in this case is approximately at the point where Highway 24 crosses the railroad right-of-way near Kenneth, Indiana." The parties also stipulated that "[t]here are no Plaintiffs in the case for whom this purported difference in the end point would make a difference as to either participation in the case or as to the Defendant's liability."

& R Line), but the Winamac Southern Railway Company continued to operate over the line. In 1997, the Toledo, Peoria & Western Railway Corporation (Toledo Railway) leased the line and operated service on the rail line. Also in 1997, Cargill, Inc. acquired the stock in A & R Line in order to ensure service to its grain elevator. Cargill, Inc. eventually sold the A & R Line to RailAmerica, Inc. The last rail service on the line occurred on September 16, 2002. The parties have represented that the rails, ties and switches have been removed.

On July 31, 2003, Toledo Railway filed a Petition for a "Discontinuance Exemption" and A & R Line filed a Petition for an "Abandonment Exemption" with the STB seeking an exemption under 49 U.S.C. § 10502 (2006). The petition stated:

> In addition to there being no demand for service over the Line, abandonment of and discontinuance of service over the Line would allow Petitioners to eliminate about $80,000 in annual maintenance costs and to sell or reuse $525,000 worth of rail, ties and other track materials. Petitioners do not intend to salvage the bridges on the Line. Indeed, Petitioners believe that trail use may be the best alternative use for the Line. Therefore, Petitioners will not incur any cost to remove bridges.

■ On October 10, 2003, the Indiana Trails Fund, Inc. filed a request for the issuance of a Public Use Condition and Interim Trail Use Condition for the rail line, instead of abandonment authorization. The Indiana Trails Fund, Inc. identified itself as "a private/public interest organization interested in the conservation of railroad right-of-ways for both rail reuse and for such non-

motor transportation as walking." The Indiana Trails Fund, Inc. offered to assume full responsibility for management, finances, and legal liability arising out of the proposed railbanking[2] of the railroad rights-of-way.[3] The Indiana Trails Fund, Inc. acknowledged that "use of the right-of-way is subject to possible future reconstruction and reactivation of the right-of-way for rail service." On October 20, 2003, the A & R Line filed a letter with the STB stating that it "agrees to negotiate trail use pursuant to 16 U.S.C. § 1247(d) for the entire 15.9–mile[4] rail line between milepost 5.1W, near Kenneth, IN, and milepost 21.0W, near Winamac, IN, the end of the line, in Cass and Pulaski Counties, IN with Indiana Trails Fund, Inc."

On November 18, 2003, the STB issued a "Decision and NITU or Abandonment" granting the exemptions requested by the Toledo Railway and the A & R Line, "subject to trail use, public use, environmental, and standard employee protective conditions as appropriate." *A & R Line, Inc.—Abandonment Exemption—in Cass and Pulaski Counties, In,* STB Docket Nos. AB–855 (Sub–No. 1X), AB–847 (Sub–No. 2X), 2003 WL 22723217, at *1 (S.T.B. Nov. 18, 2003). Subject to certain conditions, the STB also exempted "from the prior approval requirements of 49 U.S.C. 10903 the abandonment by A & R of, and the discontinuance of service by TP & W [Toledo, Peoria & Western Railway Corporation] over, the above-described line." *A & R Line, Inc.—Abandonment Exemption—in Cass and Pulaski Counties, In,* 2003 WL 22723217, at *7. As part of its decision, the STB stated it would issue a NITU pursuant to the Trails Act for the rail line, and provided A & R Line and the Indiana Trails Fund, Inc. 180 days to

---

**2.** "The term railbanking refers to the 'preservation of railroad corridor for future rail use,' while making the corridor available for other activities." *Caldwell v. United States,* 57 Fed.Cl. 193, 194 (2003) (quoting *Neb. Trails Council v. Surface Transp. Bd.,* 120 F.3d 901, 903 n. 1 (8th Cir.1997)), *aff'd,* 391 F.3d 1226 (Fed.Cir.2004), *reh'g en banc denied* (Fed.Cir.), *cert. denied,* 546 U.S. 826, 126 S.Ct. 366, 163 L.Ed.2d 72 (2005).

**3.** The Indiana Trails Fund, Inc. initially filed a request that a Public Use Condition be imposed between milepost 5.1W and milepost 21.0W. After the STB had granted its request, the Indiana

Trails Fund, Inc. became aware that it had incorrectly described the mileposts in its initial request as 5.1W, and filed to amend its request to cover milepost 0.0 through milepost 21.0W. On March 5, 2004, the amended request was granted by the STB, which revised its initial decision to cover milepost 0.0 through milepost 21.0W.

**4.** The difference in the length of the line identified earlier by the parties, and as identified in A & R Line's letter of October 20, 2003, concerns the two different mileposts indicated by the railroad for the end point, 5.1W, versus 0.0.

negotiate a trail use agreement, failing which, A & R Line could fully abandon the rail line. The STB noted that "[u]se of the right-of-way for trail purposes is subject to restoration for railroad purposes." *Id.* at *5.

On November 29, 2005, by quit-claim deed, A & R Line and the Indiana Trails Fund, Inc. entered into an agreement to transfer ownership of the railroad rights-of-way to the Indiana Trails Fund, Inc. The quit-claim deed states:

> THIS INDENTURE, made this 29th day of November, 2005 between A & R LINE, INC., an Indiana corporation ("Grantor"), and INDIANA TRAILS FUND, INC., a nonprofit corporation organized under that [sic] laws of Indiana ("Grantee"),
>
> WHEREAS, Grantor has operated a certain line of railroad or rail transportation corridor between Kenneth and Winamac, Indiana, but such operation has recently proven unprofitable, and
>
> WHEREAS, Grantee has requested to use said rail transportation corridor for Interim Trail Usage, under the National Trails Systems Act, 16 U.S.C. 1247(d), and grantor has agreed to a conveyance for such purposes;
>
> NOW THEREFORE, Grantor, QUIT-CLAIMS to Grantee, for the sum of Ten Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor's interest in certain real estate located in Cass County and Pulaski County, Indiana, which is more particularly described as follows (the "Real Estate");
>
> All the certain property of the A & R Line, Inc., together with all of the improvements thereon, being portions of the A & R Lines, Inc.'s lines of railroad known as Line Code 3107, situated in the Counties of Cass and Pulaski, in the State of Indiana, and described below and generally indicated on A & R Line, Inc. Case Plans (as described in Investors Title Insurance Company title poli-

cy no. O–A 007729, and also defined as the following parcels by the Recorders' offices of Cass and Pulaski Counties:

> \* \* \*

> This Deed is made pursuant to Section 8(d) of the National Trails System Act, 16 U.S.C. Section 1247(d), and subject to the Trail Use Conditions imposed by the U.S. Surface Transportation Board in STB Docket No. AB–855 (Sub–No. IX). Grantee assumes all financial, managerial and legal responsibility and liability for use of the premises, and agrees to defend, indemnify and hold Grantor harmless therefore. It is agreed and understood that any conservation/recreation use by Grantee shall not impair any future restoration of rail service pursuant to the National Trails System Act.

On May 29, 2009, the Indiana Trails Fund, Inc. and the Friends of the Panhandle Pathway, Inc., an Indiana non-profit corporation, jointly petitioned the STB to substitute the Friends of the Panhandle Pathway, Inc. for the Indiana Trails Fund, Inc. as the "Holder of Interim Trail Use/Trail Manager/Responsible Party" for the rail line. On June 12, 2009, the STB granted their request by vacating the then existing NITU issued to the Indiana Trails Fund, Inc., and issuing "a replacement NITU authorizing Friends of the Panhandle Pathway, Incorporated as the new interim trail use proponent for the rail line." [5]

On September 1, 2009, plaintiffs filed suit in the United States Court of Federal Claims alleging that the issuance of the November 18, 2003 NITU effected a compensable taking by the United States, pursuant to the Fifth Amendment to the United States Constitution. Plaintiffs claim:

> Pursuant to Indiana law, when A & R [Line] and the Toledo, Peoria & Western Railway Corporation (TP & W) ceased operation of a railroad over the Plaintiffs' property and took steps demonstrating abandonment, the easement was aban-

---

**5.** Plaintiffs' takings claims accrued when the original NITU issued. The fact that the STB issued a replacement NITU, as opposed to a substitution order, does not alter this conclusion.

*See Barclay v. United States,* 443 F.3d 1368, 1377–78 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2006), *cert. denied,* 846 U.S. 1209 (2007).

doned and the Plaintiffs regained the right to use and possess their property free of any easement.

According to plaintiffs, each of the plaintiffs in the above captioned case is a fee simple owner of real property situated adjacent to or underlying the rail line at issue in Cass and Pulaski Counties, Indiana. Moreover, plaintiffs allege that when each plaintiff purchased their property, their respective titles were encumbered by railroad rights-of-way easements, which had been obtained by prescription or condemnation.[6]

6. Prior to the parties' June 21, 2012 joint submission, the parties represented to the court that at least one easement had been obtained by deed. The parties now stipulate that there are no deeds affecting any of the compensable claims. According to the information supplied to the court, the plaintiffs currently before this court in this matter are, in alphabetical order: Richard T. Arrasmith (PID # 66–09–08–330–006.000–017); Martha Badovinac (Parcel ID (PID) # 0302015002); Linda L. Baker (PID # 66–08–30–300–047.000–006; # 66–08–30–300–059.000–006; # 66–08–30–300–029.000–006); Banta Farms, Inc. (PID # 1107063002; # 1107075002; # 1107075004; # 1107063001); Gene M. Barr (PID # 0302025001); Brian K. Berkshire (PID # 66–09–08–300–013.000–017; # 66–09–08–300–015.000–017); Clyde Berkshire Revocable Trust (PID # 0302025019); Berkshire Implement Co. Inc. (PID # 0302015003; # 0302015004); Jon Berry Revocable Trust c/o Jon Berry (PID # 1107051005); Paul A. Bonnell (PID # 66–07–24–400–040.000–010); Bonnell Enterprises, Inc. c/o Paul Bonnell (PID # 66–07–24–400–038.000–010); Jeffrey Braun (PID # 66–07–24–200–003.000–010); Jerry Braun (PID # 66–08–30–300–032.000–006); Max A. Brubaker (PID # 1107063009); Max A. Brubaker c/o Barbara Butts (PID # 1107062005; # 1107063074); Richard L. Byers, Sr. (PID # 1107062010); Cass County c/o John Hillis, County Attorney (PID # 1408077007; # 1408077013); Brock J. Courtice (PID # 2302074021; # 2302074020); Sherry D. Crawford (PID # 66–09–08–300–026.000–017); Larry W. Day (PID # 66–09–08–300–027.000–017; # 66–09–08–300–028.000–017; # 66–09–08–300–029.000–017; # 66–09–08–300–030.000–017; # 66–09–08–300–031.000–017; # 66–09–08–300–033.000–017; # 66–09–08–300–036.000–017; # 66–09–08–300–037.000–017 # 66–09–08–442–019.000–017); DDSV, Inc. (PID # 66–07–24–400–027.000–010; # 66–07–24–200–100.002–010; # 66–07–24–200–051.001–010; # 66–07–24–200.022.003–010); Rick L. Delon (PID # 0302003012; # 0302003013; # 66–09–34–300–012.000–017; # 66–09–34–300–016.000–017; # 66–09–33–400–011.000–000); Patricia A. Delon (PID # 0302003021); Bryan E. DePoy (PID # 2302107057); Lee E. DePoy (PID # 0302015007); Harry DePoy (PID # 66–07–24–400–075.000–010); Warren L. Dodrill (PID # 1408076041); Derek M. Drummond (PID # 1408076003); Karrell K. Dubois (PID # 66–09–08–200–008.000–017); Farmers Grain and Supply Co. of Thornhope (PID # 66–09–28–400–012.000–017; # 66–09–28–400–018.000–017; # 66–09–28–400–021.000–017; # 66–09–28–400–021.000–017; # 66–09–33–100–003.000– 017; # 66–09–33–100–005.000–017; # 66–09–33–100–004.000–017 # 66–09–33–100–014.000–017); John Faygan, Jr. (PID # 66–07–24–102–096.000–010); Margaret Fiedler, f/k/a Margaret Jones c/o Community State Bank as Trustee (PID # 0302003004); Douglas Fox (PID # 0302010016; # 0302010014); Teresa Lee Franklin (personal representative of Maurice L. Nice) (PID # 1107051014); Donald E. Galbreath (PID # 66–07–24–400–060.000–010); Calvin C. Gellinger (PID # 1107076022; # 1107076019); Richard A. Gates (PID # 2302094014; # 2302094017; # 2302107007); Goodrich Living Trust et al. c/o Howard A. Goodrich (PID # 0302023010; # 0302026006); Robert W. Gundrum Living Trust c/o Christina Becker (PID # 0302010008; # 0302010007); Ralph E. Hardy (PID # 2302094001; # 2302107037); Donald W. Hatton (PID # 1708077008; # 1708077003; # 1708077004; # 1708076005); Raymond V. Henry (PID # 66–07–24–400–059.000–010); Neil E. Hoesel Family Trust c/o Neil E. & Dixie K. Hoesel Trustees (PID # 66–09–06–400–010.000–017; # 66–08–31–400–016.000–006; # 66–08–31–400–061.001–006); Henry L. Howard (PID # 66–09–21–300–006.000–017); Kenneth Hurlburt (PID # 66–09–28–400–008.000–017); Kenneth W. Hurlburt, Jr. (PID # 66–09–28–442–002.000–017; # 66–09–28–442–001.000–017; # 66–09–28–442–003.000–017; # 66–09–28–442–004.000–017); J. Beckhem Group, LLC c/o Mary Browning (PID # 2302100014); Dorothy B. Jones (PID # 2302108002; # 0302023013; # 0302023014); Michael E. Kasten, Jr. (PID # 66–09–21–300–013.000–017); Kenneth Farms, Inc. (PID # 0302036005; # 0302036006; # 0302036007; # 1107063013); Willis R. Kesling (PID # 0302015014; # 0302015015; # 0302015017); Jerry L. Kistler (PID # 1107062015); Malinda L. Knebel (PID # 2302110014; # 2302110015; # 2302110016; # 2302110017; # 2302110018; # 2302110019; # 2302110020; # 2302110021; # 2302110022; # 2302110023); Stephen K. Knebel, et al., by and through Sandra Knebel (PID # 66–09–05–300–009.000–017; # 66–09–05–300–020.000–017; # 66–09–05–300–021.000–017); Timothy J. Kuhn (PID # 66–09–28–400–006.000–017; # 66–09–28–400–026.000–017; # 66–09–28–400–001.000–017); Darla R. Kumler, et al. c/o Owen E. McVay; (PID # 0302025008; # 0302036008); David L. Lawson (PID # 2302094009); Richard A. Layer (PID # 0302003016); Leonard Farms, Inc. c/o David Leonard (PID # 66–07–25–800–012.000–010; # 66–08–30–200–004.000–006); Marsha Lucy c/o Claude Collins (PID # 1107062007); George Martindale (PID # 66–09–08–447–003.000–017; # 66–09–08–447–

The first issue presented in the above captioned case was whether, when the STB issued the NITU and authorized recreational trail use on the railroad rights-of-way running through the plaintiffs' lands, the United States effected a taking for which the plaintiffs were entitled to compensation under the Fifth Amendment to the United States Constitution. *See Preseault v. United States,* 100 F.3d 1525, 1529 (Fed.Cir.1996) (*Preseault II* ). To reach a decision, this court had to determine whether, under Indiana law, railbanking with interim trail use is within the scope of the railroad easements that encumber plaintiffs' property. *See id.* at 1533; *see also Barclay v. United States,* 443 F.3d at 1374 n. 4. The parties disagreed as to whether controlling precedent existed pursuant to Indiana law to resolve the issue. After consideration, this court concluded that the issue previously had not been resolved by the Indiana Supreme Court, and, on May 6, 2011, certified the following question to the Indiana Supreme Court:

Under Indiana law, are railbanking and interim trail use pursuant to 16 U.S.C. § 1247(d) uses that are within the scope of the easements acquired by the railroad companies either by prescription, condemnation, or the deed at issue;[7] and if either is not within the scope of the easements originally acquired, is railbanking with interim trial use a shifting public use?

*Howard, et al. v. United States,* 100 Fed.Cl. 230, 239 (2011), *cert. answered,* 964 N.E.2d 779 (Ind.2012).

The Indiana Supreme Court accepted certification, *Howard, et al. v. United States,* 948 N.E.2d 1179 (Ind.2011), and issued an opinion on March 20, 2012, determining that:

Applying the law to this case, we hold that a public trail is not within the scope of easements acquired for the purpose of operating a line of railway. The original interest obtained as against the landowners' predecessors in title was no greater than the purpose for which the easement was used at that time. That purpose was the transportation of goods through the

005.000–017; # 66–09–08–447–008.000–017; # 66–09–08–447–019.000–017; # 66–09–08–447–020.000–017); Homer Martindale (PID # 66–09–08–200–011.000–017; # 66–09–08–200–012.000–017); Clifford E. Miller Revocable Living Trust (PID # 0302015018); Mary E. Miller, et al. (PID # 66–09–05–300–015.000–017; # 66–09–05–300–016.000–017; # 66–09–08–200–009.000–017; # 66–09–08–200–020.000–017; # 66–09–08–200–025.000–017; # 66–09–08–200–027.000–017); Paul R. Miller (PID # 0302025006); Stephen F. Miller (PID # 66–09–08–200–003.000–017; # 66–09–08–200–002.000–017); Dorothy Morrison (PID # 2302109029); James S. Nethercutt (PID # 66–09–28–200–013.000–017; # 66–09–28–200–019.000–017); Lawrence Nies, et al. (PID # 2302080010; # 2302080011); Jaqueline E. Nowak (PID # 2302100012); Margery A. Penn c/o Security Federal Savings Bank (PID # 66–09–33–100–002.000–017); A.L. Perry Family Limited Partnership (PID # 66–08–31–100–013.000–006; # 66–08–31–200–009.000–006; # 66–08–31–200–043.000–006; # 66–09–17–400–012.000–017; # 0302025020; # 0302036011; # 0302025020; # 0302036011); Donald C. Ploss (PID # 66–08–30–300–054.000–006); Robert L. Powers (PID # 66–07–11–600–030.000–010); Michael Quaglio (PID # 1408076040); Eugene Ralph (PID # 66–09–08–200–010.000–017; # 66–09–08–200–021.000–017; # 66–09–08–200–048.000–017); Royal Center Masonic Lodge # 585 c/o Ralph Kauffman (PID # 2302107018); Terry L. Ruff (PID # 66–

09–21–300–015.000–017; # 66–09–08–300–003.000–017; # 66–09–28–200–004.000–017); Douglas K. Schroder (PID # 2302107012); Dennis Shidler c/o Richard Compton (PID # 0302015001); Warren S. Shively (PID # 2302109005); John R. Simmermaker (PID # 66–09–08–330–001.000–017; # 66–09–17–100–004.000–017; # 66–09–17–100–010.000–017; # 66–09–17–400–013.000–017); Debra S. Smith (PID # 1408077029); Glenn R. Smith (PID # 66–09–08–300–035.000–017; # 66–09–08–300–032.000–017); Jerry A. Smith (PID # 66–08–31–200–058.000–006); Nancy L. Smith (PID # 1107076024); Lavina M. Todd (PID # 2302094003; # 2302094002); Mary E. Wagner Revocable Living Trust (PID # 66–09–06–100–005.000–017); Robert L. Ward (PID # 110762020); Michael J. Weaver (PID # 66–08–31–400–041.000–006; # 66–08–30–300–016.000–006; # 66–08–31–400–017.000–006); Jerry J. Weese (PID # 66–08–31–200–053.000–006); Katherine A. White (PID # 66–09–08033.000–017); Ronald A. White (PID # 66–08–31–100–010.000–006; # 66–08–31010.001–006); Robert Widup (PID # 66–14–14–104–013.000–011; # 66–14–14014.000–011); Mary K. Williamson (PID # 66–08–31–200–051.000–006); and James R. Zeider (PID # 2302107104).

7. As noted above, the parties originally represented to the court that the easements the railroad acquired by deed were also relevant to this case, but since have stipulated that there are no deeds at issue.

**352**

operation of a railroad line. The easement cannot now be recast for use as a public recreational trail without exceeding the scope of the easement and infringing the rights of the landowners.

*Howard, et al. v. United States*, 964 N.E.2d 779, 782–83 (Ind.2012) (citations omitted).

■ The Indiana Supreme Court rejected the "shifting public use" doctrine offered by the defendant in support of its position.[8] The court wrote: "The transformation of a line of railway to a public trail imputes a different purpose. The operation of a railroad line is a commercial enterprise of transport. Whereas as public trail is an activity of 'recreation, not transportation.'" *Id.* at 784 (quoting *Preseault II*, 100 F.3d at 1554).

■ The Indiana Supreme Court also indicated that whether a railroad easement has been abandoned is governed by Indiana statutory law. *See Howard, et al. v. United States*, 964 N.E.2d at 781. The Indiana Supreme Court stated:

> ("[T]he common law on whether abandonment [of railroad easements] has occurred was superseded by the General Assembly."). One means of preserving the railroad easements is by converting it to a recreational trail under the Trails Act. Ind. Code § 32–23–11–7 ("A right-of-way is not considered abandoned if the [ICC][9] or [STB] imposes on the right-of-way a trail use condition under 16 U.S.C. § 1247(d)."). Accordingly, such rights-of-way may be "railbanked" indefinitely because such action does not abandon the easement but rather preserves it.

*Howard, et al. v. United States*, 964 N.E.2d at 781 (quoting *Consol. Rail Corp., Inc. v. Lewellen*, 682 N.E.2d 779, 783 (Ind.1997) and Ind.Code § 32–23–11–7 (2012)) (alterations in original). In sum, the Indiana Supreme Court found:

We hold that, under Indiana law, railbanking and interim trail use pursuant to the federal Trails Act are not within the scope of railroad easements and that railbanking and interim trail use do not constitute a permissible shifting public use.

*Howard, et al. v. United States*, 964 N.E.2d at 784. After the Indiana Supreme Court's decision, the parties filed cross-motions for partial summary judgment on the proper methodology to determine the measure of just compensation. Plaintiffs contend that, "[t]he correct measure of damages is the difference between the value of Plaintiffs' land 'unencumbered' by a railroad easement and the value of Plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad...." Plaintiffs assert:

> In the present case, when railroad operations ceased, the purpose of the original grants terminated and Plaintiffs should have enjoyed full use and dominion over their land free of any easement of any kind, but instead the Defendant authorized the establishment of a linear public park— a new and different easement—and the Plaintiffs are due compensation for the taking of their right to have unencumbered land.

According to plaintiffs, "it is the federal government's ***authorization*** of the inconsistent use that causes a taking; quite simply, the railroad purpose easements ***would have been extinguished*** and Plaintiffs thereby **would have unencumbered land** but for the federal NITU." (quoting *Raulerson v. United States*, 99 Fed.Cl. 9, 12 (2011)) (all emphasis in original). Plaintiffs further state that, "[w]]ithout the Trails Act, there is no NITU; without the NITU there is no imposition of trail use. Therefore, absent the Trails Act, the easement would have been abandoned pursuant to Indiana Code § 32–23–11–6(a)(2) when the railroad was absolved of its com-

---

**8.** As explained by the United States Court of Appeals for the Federal Circuit in *Toews v. United States*, 376 F.3d 1371 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2004), "[t]he Government's argument that a railroad's use of an easement may transmogrify into the public's use as a recreational trail and linear park stands on a doctrine sometimes referred to as the 'shifting public use' doctrine." *Id.* at 1377.

**9.** The STB assumed many of the Interstate Commerce Commission's (ICC) functions subsequent to the ICC's closure. *See* Interstate Commerce Commission Termination Act, Pub.L. 104–88, § 109 Stat. 803 (1995); *see also Toews v. United States*, 376 F.3d at 1373 n. 4.

mon carrier obligation and its tracks were removed."

In contrast, defendant "requests that the Court enter an order finding that, pursuant to Indiana Law, the issuance of a Notice of Interim Trail Use by the Surface Transportation Board did not result in the taking of Plaintiffs' unencumbered fee interest." Defendant contends that "[t]he appropriate measure of just compensation to which the Plaintiffs are entitled is the difference between the fair market value of a claimants' property burdened by the railroad easement and without a trail use easement and the fair market value of the property burdened by both the railroad easement and a trail use easement." Defendant further states:

> At the time the NITU was issued, the railroad company ("A & R Line, Inc.") had not abandoned its easement under state law, and Indiana law precludes a finding of abandonment upon the issuance of a NITU. Therefore, the property remained at all times subject to a railroad easement. See *Preseault I*, 494 U.S. [1,] 22 [110 S.Ct. 914 (1990)] (explaining that railbanking "do[es] not displace state law as the traditional source of the real property interests").... Given that the right-of-way is still burdened by the railroad company's easement as a matter of state law, the most that has been taken is the right to exclude the general public from use of the right-of-way as a result of the conversion to a recreational trail.

According to defendant, the government's proposed measure of damages is proper because under Indiana law, "neither railbanking, discontinuance, sale to a non-railroad entity, nor use beyond the scope of the easement causes an abandonment under Indiana law."

## DISCUSSION

In the parties' cross-motions for summary judgment on the proper measure of damages, at issue is whether the proper valuation of the taken property in its "before taken" condition should account for an existing railroad easement that later could be converted into a trail, or whether the property should be valued as unencumbered by any easement in its "before taken" condition. Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) (2012) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) (2012) and is similar, both in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed.R.Civ.P. 56(a); *see also Alabama v. North Carolina*, — U.S. ——, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010); *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1325 (Fed.Cir.), *reh'g denied* (Fed. Cir. 2010); *Consol. Coal Co. v. United States*, 615 F.3d 1378, 1380 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2010), *cert. denied*, — U.S. ——, 131 S.Ct. 2990, 180 L.Ed.2d 821 (2011); *1st Home Liquidating Trust v. United States*, 581 F.3d 1350, 1355 (Fed.Cir.2009); *Arko Exec. Servs., Inc. v. United States*, 553 F.3d 1375, 1378 (Fed.Cir. 2009); *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed.Cir.2008), *reh'g and reh'g en banc denied*, 556 F.3d 1329 (Fed.Cir.2009); *Moden v. United States*, 404 F.3d 1335, 1342 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2005); *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1370–71 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir. 2004), *cert. denied*, 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005); *Cohen v. United States*, 100 Fed.Cl. 461, 469 (2011); *Boensel v. United States*, 99 Fed.Cl. 607, 610 (2011).

 Pursuant to the Tucker Act, the United States Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000.00, "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C.

§ 1491(a)(1) (2006). The United States Supreme Court has declared: "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." *Preseault v. Interstate Commerce Comm'n,*[10] 494 U.S. 1, 12, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (*Preseault I* ) (quoting *United States v. Causby,* 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)); *see also Morris v. United States,* 392 F.3d 1372, 1375 (Fed.Cir.2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."); *Lion Raisins, Inc. v. United States,* 416 F.3d 1356, 1368 (Fed.Cir.2005); *Narramore v. United States,* 960 F.2d 1048, 1052 (Fed.Cir.1992); *Perry v. United States,* 28 Fed.Cl. 82, 84 (1993).

 The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from " 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Palazzolo v. Rhode Island,* 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)); *see also Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 123–24, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978); *Lingle v. Chevron*

*U.S.A. Inc.,* 544 U.S. 528, 536, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *E. Enters. v. Apfel,* 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *Rose Acre Farms, Inc. v. United States,* 559 F.3d 1260, 1266 (Fed. Cir.), *reh'g en banc denied* (Fed.Cir. 2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 1501, 176 L.Ed.2d 109 (2010); *Janowsky v. United States,* 133 F.3d 888, 892 (Fed.Cir.1998); *Resource Invs., Inc. v. United States,* 85 Fed. Cl. 447, 469–70 (2009); *Pumpelly v. Green Bay & Miss. Canal Co.,* 80 U.S. (13 Wall.) 166, 179, 20 L.Ed. 557 (1871) (citing to principles which establish that "private property may be taken for public uses when public necessity or utility requires," and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified.").

 If a plaintiff has a valid property interest, the government takes that interest by destroying, physically occupying, or excessively regulating it for a public purpose. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* —— U.S. ——, 130 S.Ct. 2592, 2601, 177 L.Ed.2d 184 (2010); *Boyle v. United States,* 200 F.3d 1369, 1374 (Fed.Cir. 2000). " 'When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof.' " *Brown v. Legal Found. of Wash.,* 538 U.S. 216, 233, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321–23, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)) (citations omitted); *see also John R. Sand & Gravel Co. v. Unit-*

10. *Preseault v. Interstate Commerce Commission,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1, is a 1990 United States Supreme Court decision and is often referred to as *Preseault I.* In *Preseault I,* the Supreme Court concluded that although the Trails Act represented a valid exercise of Congressional power under the Commerce Clause of the United States Constitution, when railroad rights-of-way are converted to interim public trail use under the Trails Act, and trail use exceeds the scope of the easements, the Fifth Amendment to the United States Constitution entitles affected property holders to just compensation. *See generally Preseault I,* 494 U.S. 1, 110 S.Ct. 914. Subsequently, in 1996, the United

States Court of Appeals for the Federal Circuit issued a decision also involving the Preseaults, *Preseault II,* 100 F.3d 1525. As explained by the Federal Circuit in *Preseault II,* "[t]he Preseaults own a fee simple interest in a tract of land.... The dispute centers on three parcels within this tract, areas over which the original railroad right-of-way ran." *Id.* at 1531. In *Preseault II,* the Federal Circuit concluded that "[w]hen state-defined property rights are destroyed by the Federal Government's preemptive power in circumstances such as those here before us, the owner of those rights is due just compensation." *Preseault II,* 100 F.3d at 1552.

*ed States*, 457 F.3d 1345, 1357 (Fed.Cir.) ("[A] permanent physical occupation by the government is a per se physical taking requiring compensation under the Fifth Amendment because it destroys, among other rights, a property owner's right to exclude."), *reh'g en banc denied* (Fed.Cir. 2006), *aff'd*, 552 U.S. 130, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008). The United States Supreme Court has indicated that when "deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole...." *Penn Central Transp. Co. v. City of New York*, 438 U.S. at 130–31, 98 S.Ct. 2646. If a plaintiff does possess a property interest, the court decides if the "property has been deprived or abridged sufficiently to qualify as 'taken.'" *Northwest La. Fish & Game Pres. Comm'n v. United States*, 574 F.3d 1386, 1390 (Fed.Cir.2009) (quoting *Members of Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir. 2005), *cert. denied*, 548 U.S. 904, 126 S.Ct. 2967, 165 L.Ed.2d 951 (2006)), *cert. denied*, ── U.S. ──, 130 S.Ct. 1072, 175 L.Ed.2d 886 (2010); *see also Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed.Cir.2009), cert. *denied*, ── U.S. ──, 130 S.Ct. 2402, 176 L.Ed.2d 922 (2010); *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed.Cir. 2002), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003); *Wyatt v. United States*, 271 F.3d 1090, 1099–1100 (Fed.Cir. 2001), *cert. denied*, 535 U.S. 1077, 122 S.Ct. 1960, 152 L.Ed.2d 1021 (2002); *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir.2000), *cert. denied*, 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001).

■■■■■■ To determine the nature of a property interest, the court looks to state law. The United States Court of Appeals for the Federal Circuit, interpreting a railroad right-of-way takings claim, stated that, "state law generally creates the property interest in a railroad right-of-way." *Barclay v. United States*, 443 F.3d at 1374 (citing *Preseault I*, 494 U.S. at 8, 16, 110 S.Ct. 914). In a footnote on the same page, the court stated, "[i]n *Toews v. United States*, 376 F.3d 1371 (Fed.Cir.2004), we reiterated that state law controls the basic issue of whether trail use is beyond the scope of the right-of-way." *Barclay v. United States*, 443 F.3d at 1374 n. 4. Similarly, "[t]he nature of the interest conveyed is determined according to the law of the state where the conveyance occurred. 'State law creates and defines the scope of the reversionary [11] or other real property interests affected by the ICC's [Interstate Commerce Commission] action pursuant to Section 208 of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d).'" *Chevy Chase Land Co. of Montgomery Cnty. v. United States*, 37 Fed. Cl. 545, 565 (1997) (quoting *Preseault I*, 494 U.S. at 20, 110 S.Ct. 914 (O'Connor, J., concurring) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984))), *aff'd*, 230 F.3d 1375 (Fed.Cir.1999), *reh'g and reh'g en banc denied* (Fed.Cir.), *cert. denied*, 531 U.S. 957, 121 S.Ct. 380, 148 L.Ed.2d 293 (2000).

In *Ruckelshaus v. Monsanto Co.*, 467 U.S. at 1001, 104 S.Ct. 2862, the Supreme Court stated, "we are mindful of the basic axiom that ' "[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." ' " (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972))) (omission in original). In *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977),

---

**11.** Although the term "reversionary" is frequently used by rails to trails practitioners and courts to refer to when property encumbered by an easement becomes fully possessory because the easement is extinguished, in a decision issued by the United States Court of Appeals for the Federal Circuit, the court has noted, "labeling the retained interest [in property encumbered by an easement] a 'reversion' is not consistent with the traditional classification scheme, which views the interest as a present estate in fee simple, subject to the burden of the easement." *Preseault II*, 100 F.3d at 1533.

the United States Supreme Court stated that, "[u]nder our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States." *Id.* at 378, 97 S.Ct. 582; *see also Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 155, 64 S.Ct. 474, 88 L.Ed. 635 (1944) ("The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state."). The United States Court of Appeals for the Federal Circuit also has directed that state law determines whether trail use exceeds the scope of the easement. *See generally Toews v. United States,* 376 F.3d 1371; *see also Preseault II,* 100 F.3d at 1541–42.

▆ The parties agree that A & R Line's predecessors acquired only easements for most of the properties at issue in the above captioned case.[12] Moreover, the Indiana Supreme Court has determined that, "[u]nder Indiana law, railbanking and interim trail use pursuant to 16 U.S.C. § 1274(d) are not uses within the scope of th[ose] easements...." *Howard, et al. v. United States,* 964 N.E.2d at 780. In its cross-motion for partial summary judgment the defendant conceded that, "[t]he Indiana Supreme Court determined that railbanking and trail use are beyond the scope of easements acquired by the railroad company by prescription, condemnation and the easement deed at issue in this case." Because the A & R Line's predecessors acquired only easements, and because the easements were not sufficiently broad to contemplate trail use, the government is liable to the plaintiffs in the above captioned case for the property interests that it has taken.

With respect to the measure of damages, according to the plaintiffs, "[b]ut for operation of the Trails Act, the Plaintiffs would have the exclusive right to physical ownership, possession and use of their property free of any easement for recreational trail use or future railroad use. By operation of the Trails Act, the United States took the

Plaintiffs' property for which it is Constitutionally obligated to pay just compensation." The plaintiffs therefore argue "that the measure of just compensation pursuant to the Fifth Amendment for the taking of Plaintiffs' property by operation of the Trails Act (16 U.S.C. § 1241), must be the difference between an unencumbered fee and a fee encumbered with an easement for public trail use for the indefinite future." Plaintiffs assert:

> But for the federal intervention, under state law Plaintiffs would have had unencumbered land free and clear of the railroad purpose easement that once existed because permitting use as a trial was outside the scope of the railroad purpose easement, and would have resulted in extinguishment of the railroad easement under state law.... Thus, but for the NITU, the resulting termination/extinguishment of the railroad purpose easement would have meant that the landowner *would have had no* railroad easement *and no* trail on his land. Therefore the measure of damages for the Plaintiffs here is: The difference between the value of Plaintiffs' land free and clear of any easement and the value of their land with a Trails Act-imposed public trail of indefinite duration over the space the railroad easement had occupied.

(all emphasis in original). Plaintiffs also argue that, as in *Rogers v. United States,* 101 Fed.Cl. 287, 295–96 (2011), to apply common law theories of abandonment in this rails-to-trails case is "a red herring."

The defendant, however, argues:

> Pursuant to Ind.Code §§ 32–23–11–6, –7, –8, a right-of-way is not abandoned when it is railbanked for future railroad use and used, in the interim, for trail use (Ind. Code § 32–23–11–7 specifically precludes a finding of abandonment based on trail use). Pursuant to Indiana statute, the issuance of a NITU does not block the Plaintiffs' right to an unencumbered fee interest when a railroad right-of-way is railbanked pursuant to 16 U.S.C. § 1247(d). Ind.Code § 32–23–11–1 *et seq.*

---

12. Defendant has engaged a professional mapping service to research the history of other parcels in order to determine whether A & R

Line's predecessors obtained a fee or an easement for certain segments of the right-of-way.

... This conclusion is also consistent with Indiana common law. Under state law, a railroad company does not abandon its railroad easement unless there is a clear intent to abandon.... Plaintiffs are not entitled to compensation based on the taking of the right to use and possess their property free of any easement because the railroad right-of-way easement is not considered abandoned as a matter of Indiana law. *See Kinsey v. Union Traction Co.*, 169 Ind. 563, 597, 81 N.E. 922, 935 (1907); *Cox v. Louisville, New Albany and Chi. R.R. Co.*, 48 Ind. 178, 194–95, 1874 WL 5972 at *8–9 (1874); *Chi. & Calumet Terminal Ry. Co. v. Whiting, Hammond, & E. Chi. St. Ry. Co.*, 139 Ind. 297, 303–304, 38 N.E. 604, 606–607 (1894).

Thus, the defendant contends, "Indiana law precludes a finding of abandonment upon the issuance of a NITU." Therefore, according to the defendant, "the property remained at all times subject to a railroad easement." (citing *Preseault I*, 494 U.S. at 22, 110 S.Ct. 914). Defendant also cites to Indiana Code section 32–23–11–8(b), which states that "[a] railroad may discontinue rail service on the right-of-way without abandoning the right-of-way." Ind.Code § 32–23–11–8(b) (2012). As such, defendant argues, "the measure of just compensation must be determined by the difference between the fair market value of a claimant's property burdened by the railroad easement and without a trail use easement and the fair market value of the property burdened by both easements, commonly referred to as a before and after method." (citing *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 632, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961)).

■ As described above, in response to this court's request for certification, the Indiana Supreme Court addressed the issue of the scope of the easements, which it determined by applying Indiana common law principles. The Indiana Supreme Court stated, "[t]he extent of the easement interest is determined by the purpose served by the easement." *Howard, et al. v. United States*, 964 N.E.2d at 781 (citing *New York Cent. R.R. Co. v. Yarian*, 219 Ind. 477, 39 N.E.2d 604, 606 (1942) and *McCauley v. Harris*, 928 N.E.2d 309, 314 (Ind.Ct.App.2010)). According to the Indiana Supreme Court, easements obtained by prescription and condemnation are limited to the purpose for which they were obtained. *Howard, et al. v. United States*, 964 N.E.2d at 781 (citing *Consumers' Gas Trust Co. v. Am. Plate Glass Co.*, 162 Ind. 393, 68 N.E. 1020, 1021 (1903); *Quick v. Taylor*, 113 Ind. 540, 16 N.E. 588, 589–90 (1888)). Applying Indiana law to the facts of the *Howard* case, the Indiana Supreme Court concluded that "a public trail is not within the scope of easements acquired for the purpose of operating a line of railway.... That purpose was the transportation of goods through the operation of a railroad line. The easement cannot now be recast for use as a public recreational trail without exceeding the scope of the easement...." *Howard, et al. v. United States*, 964 N.E.2d at 783.

■ The common law of property "in Indiana provides that, upon abandonment by the railroad, a railroad easement terminates and the fee simple interest in the land reverts to the grantor, or the grantor's heirs, assigns or devisees. More precisely, the title of the grantor no longer is subject to the burden of the easement." *Consol. Rail Corp., Inc. v. Lewellen*, 682 N.E.2d at 782; *see also Timberlake, Inc. v. O'Brien*, 902 N.E.2d 843, 852 (Ind.Ct.App.2009); *Lake County Trust Co. v. Lane*, 478 N.E.2d 684, 688 (Ind.Ct.App.), *reh'g denied*, (Ind.Ct.App.), *transfer denied* (Ind.Ct.App. 1985). Indiana does not favor the forfeiture of easements. *See Selvia v. Reitmeyer*, 156 Ind. App. 203, 295 N.E.2d 869, 874 (1973). Easements created by grant are generally not lost due to mere nonuse. *See Jeffers v. Toschlog*, 178 Ind.App. 603, 383 N.E.2d 457, 459 (1978); *GTA v. Shell Oil Co.*, 171 Ind.App. 647, 358 N.E.2d 750, 752–53 (1977). Nor will an easement necessarily be lost "simply by talking about and negotiating for a change in the use of the lot." *GTA v. Shell Oil Co.*, 358 N.E.2d at 752. "Misuser of an easement does not permit forfeiture unless ... it is impossible to sever the increased burden in such a way as to preserve to the dominant tenement that to which it is entitled." *Selvia v. Reitmeyer*, 295 N.E.2d at 874 (citing *Knotts v. Summit Park Co.*, 146 Md. 234, 126 A. 280, 283

(1924)) (Increased burden on the servient estate was brought about by the development of the dominant tenement, which was not included in the scope of the easement, and development of the easement for the dominant easement could not be preserved without the servient tenement, therefore working an abandonment of the easement).

 The Restatement (Third) of Property states that "[a] servitude terminates when it expires by its terms" and "is extinguished by abandonment when the beneficiary relinquishes the rights created by a servitude." *See* Restatement (Third) of Prop.: Servitudes §§ 7.2, 7.4 (2000). Generally, at common law, abandonment can only be established when the beneficiary's "affirmative conduct manifests the intent to relinquish the servitude." James W. Ely, Jr. & Jon W. Bruce, The Law of Easements & Licenses in Land § 10:20 (2012); *see also Consol. Rail Corp., Inc. v. Lewellen,* 682 N.E.2d at 783 (abandonment under Indiana common law required an intent to abandon and an act evincing that intent for abandonment to occur).

 In its decision on the question this court certified to the Indiana Supreme Court, the Indiana Supreme Court stated specifically that Indiana statutory law supersedes Indiana common law regarding the abandonment of railroad easements. *See Howard, et al. v. United States,* 964 N.E.2d at 781 (citing Ind.Code §§ 32–23–11–6, –7, – 8). Similarly in *Consolidated Rail Corp., Inc. v. Lewellen,* the Indiana Supreme Court stated, "the common law on whether abandonment [of railroad easements] has occurred was superseded by the General Assembly ... [i]n a statute enacted in 1987." *Consol. Rail Corp., Inc. v. Lewellen,* 682 N.E.2d at 783.

Indiana Code section 32–23–11–6, "Requirements for abandonment," states in full:

(a) Except as provided in subsection (b) and in sections 7 and 8 of this chapter, a right-of-way is considered abandoned if any of subdivisions (1) through (3) apply:

(1) Before February 28, 1920, both of the following occurred:

(A) The railroad discontinued use of the right-of-way for railroad purposes.

(B) The rails, switches, ties, and other facilities were removed from the right-of-way.

(2) After February 27, 1920, both of the following occur:

(A) The Interstate Commerce Commission or the United States Surface Transportation Board issues a certificate of public convenience and necessity relieving the railroad of the railroad's common carrier obligation on the right-of-way.

(B) The earlier of the following occurs:

(i) Rails, switches, ties, and other facilities are removed from the right-of-way, making the right-of-way unusable for continued rail traffic.

(ii) At least ten (10) years have passed from the date on which the Interstate Commerce Commission or the United States Surface Transportation Board issued a certificate of public convenience and necessity relieving the railroad of its common carrier obligation on the right-of-way.

(3) The right-of-way was abandoned under the Regional Rail Reorganization Act of 1973 (45 U.S.C. 701 et seq.).

(b) A right-of-way is not considered abandoned if:

(1) rail service continues on the right-of-way; or

(2) the railroad has entered into an agreement preserving rail service on the right-of-way.

Ind.Code § 32–23–11–6.

Indiana Code section 32–23–11–7, "Trail use," provides: "A right-of-way is not considered abandoned if the Interstate Commerce Commission or the United States Surface Transportation Board imposes on the right-of-way a trail use condition under 16 U.S.C. 1247(d)." Ind.Code § 32–23–11–7 (2012).

Indiana Code section 32–23–11–8, "Exceptions," states in full:

(a) A right-of-way is not considered abandoned if the following conditions are met:

(1) The railroad sells the railroad's rights in the right-of-way before abandoning the right-of-way.

(2) The purchaser of the railroad's rights in the right-of-way is not a railroad.

(3) The purchaser purchases the right-of-way for use by the purchaser to transport goods or materials by rail.

(b) A railroad may discontinue rail service on the right-of-way without abandoning the right-of-way.

Ind.Code § 32–23–11–8.

 The first step in statutory construction is " 'to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' " *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)); *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,* —— U.S. ——, 132 S.Ct. 1670, 1680, 182 L.Ed.2d 678 (2012) ("We begin 'where all such inquiries must begin: with the language of the statute itself.' " (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989))); *Jimenez v. Quarterman,* 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); *Bettcher Indus., Inc. v. Bunzl USA, Inc.,* 661 F.3d 629, 644 (Fed.Cir.2011); *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States,* 608 F.3d at 1323 ("When interpreting any statute, we look first to the statutory language."). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. at 341, 117 S.Ct. 843 (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) and *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991)). " 'Beyond the statute's text, the traditional tools of statutory construction include the statute's structure, canons of statutory construction,

and legislative history.' " *Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States,* 617 F.3d 1357, 1361 (Fed.Cir.) (quoting *Bull v. United States,* 479 F.3d 1365, 1376 (Fed.Cir.2007)), *reh'g en banc denied* (Fed.Cir. 2010); *see also Caraco Pharm. Laboratories, Ltd. v. Novo Nordisk A/S,* 132 S.Ct. at 1680 ("[W]e consider each question [of statutory interpretation] in the context of the entire statute." (citing *Robinson v. Shell Oil Co.,* 519 U.S. at 340, 117 S.Ct. 843)); *Roberts v. Sea–Land Services, Inc.,* —— U.S. ——, 132 S.Ct. 1350, 1356–57, 182 L.Ed.2d 341 (2012); *Bush v. United States,* 655 F.3d 1323, 1329 (Fed.Cir.) *cert. denied,* —— U.S. ——, 132 S.Ct. 2681, 183 L.Ed.2d 45 (2012).

 The initial inquiry into the statutory text ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Barnhart v. Sigmon Coal Co.,* 534 U.S. at 450, 122 S.Ct. 941 (quoting *Robinson v. Shell Oil Co.,* 519 U.S. at 340, 117 S.Ct. 843). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *See Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461, 489 n. 13, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) ("It is, moreover, ' "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or otherwise insignificant." ' " (quoting *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)))); *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible); *see also Setser v. United States,* —— U.S. ——, 132 S.Ct. 1463, 1470, 182 L.Ed.2d 455 (2012) ("Our decision today follows the interpretive rule the parties invoke, that we must 'give effect ... to every clause and word' of the Act.") (citing *United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955)); *Sharp v. United*

*States,* 580 F.3d 1234, 1238 (Fed.Cir.2009). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker,* 533 U.S. at 174, 121 S.Ct. 2120 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *see also Xianli Zhang v. United States,* 640 F.3d 1358, 1368 (Fed.Cir.2011) *cert. denied,* —— U.S. ——, 132 S.Ct. 2375, 182 L.Ed.2d 1017 (2012) (citing *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,* 400 F.3d 1352, 1365 (Fed.Cir.2005)); *Hanlin v. United States,* 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2000). The United States Supreme Court also has stated that applying "the 'normal rule of statutory construction' . . . 'identical words used in different parts of the same act are intended to have the same meaning.'" *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (quoting *Dep't of Revenue of Oregon v. ACF Indus., Inc.,* 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994)).

▬▬▬ When a statute provides a clear answer, the court's analysis is at an end. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. at 450, 122 S.Ct. 941; *see also Arko Foods Int'l, Inc. v. United States,* 654 F.3d at 1364 ("'[W]here Congress has clearly stated its intent in the language of a statute, a court should not inquire further into the meaning of the statute.'" (quoting *Millenium Lumber Distrib., Ltd. v. United States,* 558 F.3d 1326, 1328 (Fed.Cir.2009)), *reh'g denied,* 558 F.3d 1326 (Fed.Cir.2009)); *Am. Airlines, Inc. v. United States,* 551 F.3d 1294, 1300 (Fed.Cir. 2008), *reh'g granted,* 319 Fed.Appx. 914 (Fed. Cir.2009). Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Johnson v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. at 241, 109 S.Ct. 1026) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)); *see*

*also Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States,* 617 F.3d at 1361 (citing *Sharp v. United States,* 580 F.3d at 1237, *Jimenez v. Quarterman,* 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009); and *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)); *Candle Corp. of Am. v. U.S. Int'l Trade Comm'n,* 374 F.3d 1087, 1093 (Fed.Cir.2004). Indeed, in construing a statute courts "'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Schindler Elevator Corp. v. United States,* 559 U.S. 196, 131 S.Ct. 1885, 1891, 179 L.Ed.2d 825 (2011) (quoting *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 175, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)) (internal quotation marks omitted). Even "'[w]hen terms used in a statute are undefined, we give them their ordinary meaning.'" *Schindler Elevator Corp. v. United States,* 131 S.Ct. at 1891 (quoting *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *See Whitfield v. United States,* 543 U.S. 209, 215, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history."), *reh'g denied sub nom. Hall v. United States,* 544 U.S. 913, 125 S.Ct. 1606, 161 L.Ed.2d 293 (2005).

▬▬▬ The United States Supreme Court also has held that the specific terms of a statute supersede general terms within that statute or within another statute that would otherwise control. *See Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (quoting *D. Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932))); *see also Bloate v. United States,* 559 U.S. 196, 130 S.Ct. 1345, 1354, 176 L.Ed.2d 54 (2010); *Bulova Watch Co. v. United States,* 365 U.S.

753, 761, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961). A more specific statute will not be superseded by a more recent, general statute unless there is a clear indication of the legislative intent to do so. *See Morton v. Mancari,* 417 U.S. 535, 550–551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (holding specific statutes controlling over general statutes, regardless of the priority of enactment). Therefore, for a subsequently enacted statute to be held controlling, the circumstances must explicitly indicate the legislative intent to do so. *See United States v. United Cont'l Tuna,* 425 U.S. 164, 168, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976) (holding that "repeals by implication are not favored."). The principle is particularly applicable in situations in which a party seeks to have a specific statute superseded by a more general one. *Id.* at 169, 96 S.Ct. 1319; *see also Canadian Lumber Trade Alliance v. United States,* 517 F.3d 1319, 1343 (Fed.Cir.2008) (" '[f]or a later statute to be held implicitly to supercede an apparently inconsistent earlier enactment, the intent of Congress must be apparent in the circumstances.' " *(quoting Southwest Marine of San Francisco, Inc. v. United States,* 896 F.2d 532, 533 (Fed.Cir.1990))) (alteration in original). The view of a later legislative body on a statute, however, does not control how to interpret an earlier enacted statute, *see O'Gilvie v. United States,* 519 U.S. 79, 90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996), although subsequent legislation "does have persuasive value," *Bell v. New Jersey,* 461 U.S. 773, 784, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), and "is entitled to great weight in statutory construction." *Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *see also MORI Assocs., Inc. v. United States,* 102 Fed.Cl. 503, 541 (2011).

■■■■■ The Indiana state and federal canons of statutory construction are similar. *See, e.g., Kelly v. Ladywood Apartments,* 622 N.E.2d 1044, 1047 (Ind.Ct.App.1993) (citing *Economy Oil Corp. v. Ind. Dep't of State Revenue,* 162 Ind.App. 658, 321 N.E.2d 215, 218 (1974) ("When a statute is ambiguous, the court must ascertain the intent of the legislature and interpret the statute to effectuate that intent.")); *In re ITT Derivative Litig.,* 932 N.E.2d 664, 670 (Ind.2010) ("We

interpret a statute in order to give effect to every word and render no part meaningless if it can be reconciled with the rest of the statute."); *Adult Group Props., Ltd. v. Imler,* 505 N.E.2d 459, 463 (Ind.Ct.App.1987) ("When construing statutes, our foremost concern is to determine and give effect to the true intent of the legislature."); *Hurwich v. Zoss,* 170 Ind.App. 542, 353 N.E.2d 549, 552 (1976) ("In order to determine the legislative intent of a statute, we may, under the rules of statutory construction, examine all legislation in pari materia, the legislative history, and all Acts passed either before or after the statute in question."). Moreover, "[t]here is a presumption that the legislature does not intend to make any change in the common law beyond those declared in either express terms or by unmistakable implication." *Caesars Riverboat Casino, LLC v. Kephart,* 934 N.E.2d 1120, 1123 (Ind.2010). However, "[a]n abrogation of the common law will be implied (1) where a statute is enacted which undertakes to cover the entire subject treated and was clearly designed as a substitute for the common law; or, (2) where the two laws are so repugnant that both in reason may not stand." *Id.* (quoting *Irvine v. Rare Feline Breeding Ctr., Inc.,* 685 N.E.2d 120, 123 (Ind.Ct.App.1997), *transfer denied,* 698 N.E.2d 1183 (Ind.1998)).

The statutory sections of particular note applicable to the *Howard* case currently before the court are Indiana Code sections 32–23–11–6, –7 and –8(b). Indiana Code section 32–23–11–8(b) defines the effect of the discontinuance of rail service on a railroad right-of-way. "A railroad may discontinue rail service on the right-of-way without abandoning the right-of-way." Ind.Code § 32–23–11–8(b). Indiana Code section 32–23–11–7 describes the status of easements in Indiana in the event the STB issues a NITU and imposes a trail condition on the easement: "A right-of-way is not considered abandoned if the Interstate Commerce Commission or the United States Surface Transportation Board imposes on the right-of-way a trail use condition under 16 U.S.C. 1247(d)." Ind.Code § 32–23–11–7.

Because the STB issued a certificate of public convenience and necessity, relieving the A & R Line of its common carrier obligations on the rights-of-way at issue in the case currently before the court and the rails, switches, ties, and other facilities have been removed, thereby making the rights-of-way unusable for continued rail traffic, the rights-of-way would be considered abandoned under Indiana common law. Plaintiffs, therefore, would hold title free and clear of earlier encumbrances under Indiana Code section 32–23–11–6(a)(2), but for the superseding Indiana statutes. *See* Ind.Code §§ 32–23–11–6, –7. The STB imposed a trail use condition on the easements pursuant to 16 U.S.C. § 1247(d), as a result of which Indiana Code section 32–23–11–7 prevents the rights-of-way from being considered abandoned because of the federal action. Had the STB not imposed a trail use condition on plaintiffs' property, under state law plaintiffs would have been entitled to their property free and clear of encumbrances. *See Consol. Rail Corp., Inc. v. Lewellen,* 682 N.E.2d at 782; *see also Timberlake, Inc. v. O'Brien,* 902 N.E.2d at 852.

In Indiana Code section 32–23–11–6, titled, "Requirements for abandonment," subsection (a) identifies the conditions under which a "right-of-way is considered abandoned," and subsection (b) covers conditions under which "[a] right-of-way is not considered abandoned." In Indiana, a right-of-way is not considered abandoned if: "(1) rail service continues on the right-of-way; or (2) the railroad has entered into an agreement preserving rail service on the right-of-way." Ind.Code § 32–23–11–6(b). Consistent with Indiana Code section 32–23–11–6(b), Indiana Code section 32–23–11–7, titled, "Trail use," states, "[a] right-of-way is not considered abandoned if the Interstate Commerce Commission or the United States Surface Transportation Board imposes on the right-of-way a trail use condition under 16 U.S.C. 1247(d)." Furthermore, subsection (b) of Indiana Code section 32–23–11–8, titled, "Exceptions," states, "[a] railroad may discontinue rail service on the right-of-way without abandoning the right-of-way." Ind.Code § 32–23–11–8(b).

The Indiana Code at section 32–23–11–7 makes specific references to the National Trails System Act at 16 U.S.C. § 1247(d), which states, in part:

The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976 shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

16 U.S.C. § 1247(d).

"Where a term has an established legal significance it is presumed that legislators intended the same significance to attach by use of that term, absent any indications to the contrary. Thus, it is presumed that when language or statutes are adopted from another state or country, constructions placed on such language or statutes are adopted as well. This has long been accept-

ed in Indiana." *Matter of City Investing Co.*, 411 N.E.2d 420, 427 (Ind.Ct.App.1980) (citing *Clark v. Jeffersonville M. & I.R. Co.*, 44 Ind. 248 (1873), *Jensen v. Pritchard*, 120 Ind.App. 439, 90 N.E.2d 518 (1950), *reh'g denied* 120 Ind.App. 439, 91 N.E.2d 846 (1950); 2A Sutherland, Statutes and Statutory Constr. § 47.30 (4th ed. 1973); 73 Am.Jur. 2d, Statutes § 239 (1974)); *see also Tobias v. Violent Crime Comp. Div.*, 470 N.E.2d 105, 108 (Ind. Ct.App.1984) (citing *Indiana Trust Co. v. Griffith*, 176 Ind. 643, 95 N.E. 573, 575 (1911)) ("It is presumed that when the legislature incorporates a well-settled legal term into a statute it intended to use it in its judicially-construed sense unless a contrary intent is expressed in the statute."). Because of the specific reference to 16 U.S.C. § 1247(d) in the Indiana statute, it is proper to conclude that the Indiana General Assembly intended to adopt the meaning given to the word 'abandonment' in the federal Trails Act when it enacted its own legislation covering the same topic.

Further understanding of the statutory intent also is clear from the opinion received from the Indiana Supreme Court in response to this court's certification request in which the Indiana Supreme Court stated: "[t]he common law on whether abandonment [of railroad easements] has occurred was superseded by the General Assembly." *Howard, et al. v. United States*, 964 N.E.2d at 781 (quoting *Consol. Rail Corp., Inc. v. Lewellen*, 682 N.E.2d at 783 (citing Ind.Code §§ 32–23–11–7, –8)) (alterations in the original). Moreover, the Indiana Supreme Court specifically explained that section 32–23–11–7 of the Indiana Code allows for the preservation of railroad easements when they are converted to recreational trails under 16 U.S.C. § 1247(d). *See Howard, et al. v. United States*, 964 N.E.2d at 781. The Indiana Supreme Court also specified that as a result of Indiana Code section 32–23–11–7, "such rights-of-way may be 'railbanked' indefinitely because such action does not abandon the easement but rather preserves it." *Howard, et al. v. United States*, 964 N.E.2d at 781.

■ A railroad which files an application to abandon rail service with the STB, ceases railroad operations, and when the rails, switches and ties are removed, steps are taken that under common law in Indiana can manifest the intent to abandon. As stated by the Indiana Supreme Court in *Consolidated Rail Corp., Inc. v. Lewellen:*

> Under the common law of this state, the intent to abandon was a necessary element of abandonment of an easement created by express grant. *Seymour Water Company v. Lebline*, 195 Ind. 481, 489, 144 N.E. 30, 33 (1924). The question of abandonment was a question of intention to be determined from the facts of the case. *Perry v. Carey*, 68 Ind.App. 56, 60, 119 N.E. 1010, 1011 (1918). Although an easement acquired by actual grant was not extinguished by mere nonuse, nonuse plus an act indicating an intent to abandon may have had the effect of extinguishing the easement. *Id. See also Brock v. B & M Moster Farms, Inc.*, 481 N.E.2d 1106 (Ind. Ct.App.1985) (easement created by grant generally not lost through mere nonuse); *Bauer v. Harris*, 617 N.E.2d 923 (Ind.Ct. App.1993) (abandonment of prescriptive easement requires nonuse and intent to abandon).

*Consol. Rail Corp., Inc. v. Lewellen*, 682 N.E.2d at 783. As noted above, Indiana common law provides that "upon abandonment by the railroad, a railroad easement terminates and the fee simple interest in the land reverts to the grantor, or the grantor's heirs, assigns or devisees. More precisely, the title of the grantor no longer is subject to the burden of the easement." *Id.* at 782. The Indiana Supreme Court, however, has explicitly stated that the Indiana legislature has superseded the common law such that "rights-of-way may be 'railbanked' indefinitely because such action does not abandon the easement but rather preserves it." *Howard, et al. v. United States*, 964 N.E.2d at 781; *see also* Ind.Code § 32–5–12–7. The Indiana statutes, therefore, override common law principles by preventing the expiration of an easement on the property, although the new use is outside the scope of the original easements and prevents termination of the easement even though a condition precedent has occurred that would otherwise cause the easement to be extinguished under Indiana

common law. Reading all the relevant sections of the Indiana Code individually, and in concert, with the referenced federal statute, terms such as, "not considered abandoned," "not treated as . . . an abandonment," and "without abandoning" are used to describe situations in which interim trail use and railbanking occur, preventing burdened property holders from obtaining unencumbered property rights, despite the scope of the easement granted and the intent of the original easement, or conflicting, state common law.

The Indiana trails legislation has been described as relatively unique. According to the 2010 edition of Powell on Real Property, "[m]ore than 30 states have adopted 'mini' railbanking acts, though only a handful explicitly adopt the legal strategy of holding intact easements and qualified fees for railroad purposes during the interim trail use on the theory of preservation." 11 Powell on Real Property § 78A.11[4] (Matthew Bender 2010). The Powell treatise noted that three states, including Indiana, "preserve the prop-

erty rights in trust or simply hold that the conversion to interim trail use is not a cessation of railroad use." *Id.* at n. 26. Judicial analysis of these three statutes has been sparse.[13] With respect to valuation of a plaintiff's damages in a rails-to-trails case, the only cases that discuss any of the three statutes are *Macy Elevator, Inc. v. United States,* 97 Fed.Cl. 708 (2011) *(Macy I); Macy Elevator, Inc. v. United States,* 105 Fed.Cl. 195 (2012) *(Macy II);* and *Schmitt v. United States,* No. IP 99–1852–Y/S, 2003 WL 21057368 (S.D.Ind. Mar. 5, 2003).[14] Only *Macy II* specifically addresses the impact of the Indiana legislation on valuation following the issuance of a NITU. *See generally Macy II,* 105 Fed.Cl. 195.

In *Macy II,* a case also applying Indiana state law, a Judge of the United States Court of Federal Claims held that:

In Indiana, easements may terminate and the property interest may revert to the

---

**13.** The other two states were West Virginia and Montana. *See* 11 Powell on Real Property § 78A.11[4]. The Montana statute states in relevant part:

> (3) The department of transportation: (c) may negotiate for and acquire easements in the rights-of-way or the railroad rights-of-way and attendant facilities identified pursuant to subsection (3)(a) and: (i) hold all acquired lands in trust for transportation purposes. . . .

Mont.Code § 60–11–111 (2011). Only one case, *Pacific Power & Light Co. v. Montana Department of Revenue,* 246 Mont. 398, 804 P.2d 397, *reh'g denied* (1991), appears to discuss the Montana statute. In *Pacific Power & Light,* when addressing the utility's challenge to the Montana Department of Revenue's assessment of beneficial use taxes for federally owned electric power transmission lines, the Montana Supreme Court briefly noted that "[t]he State-owned railroad line in question had been acquired by the State as 'abandoned' property under § 60–11–111, MCA, and consisted of a combined distance of thirty miles of track. The two non-profit railroads were designed to promote tourism in the form of an added attraction to parts of historic Montana." *Id.* at 400–401, 804 P.2d 397.

The West Virginia statute states:

> Any and all abandoned railroad rights-of-way acquired by the state prior to the effective date of this article are hereby declared held for railroad transportation purposes as of the date of acquisition, until, by executive order of the governor, the right-of-way is declared no longer suitable for a public transportation purpose as a railroad right-of-way. Such abandoned

railroad rights-of-way shall not revert by operation of law to any other ownership while being held for future railroad use in accordance with the provisions of this article.

W.Va.Code § 5B–1A–6(b) (2010).

**14.** The plaintiffs in *Schmitt* owned property in Indiana that was encumbered by a railroad easement that had been converted to a trail pursuant to a NITU issued by the STB. *Schmitt v. United States,* 2003 WL 21057368, at *1. The plaintiffs in *Schmitt* brought a claim against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a)(2) (2006), claiming that "the conversion of their property to recreational use following the cessation of the railroad operation constituted a taking by the United States of America . . . for which they [were] entitled to just compensation under the Fifth Amendment to the United States Constitution." *Schmitt v. United States,* 2003 WL 21057368, at *1. In *Schmitt,* the United States District Court for the Southern District of Indiana found a taking because trail use was beyond the scope of the easements and the easements would have been extinguished and reverted back to the fee holders, but for the Trails Act. The court stated: "the fact that the railroad right-of-way has not been legally abandoned does not absolve the Government of liability. In fact, whether or not the easements at issue were legally abandoned is irrelevant to the takings issue; instead, the relevant issue is whether the Government's use of the recreational trail is outside the scope of the original easement." *Id.* at *7. The *Schmitt* decision, however, does not specifically address the valuation issue.

underlying fee owner not only through abandonment, but also when reversion is expressly provided for in the granting deed, *Erie–Haven, Inc. v. First Church of Christ,* 155 Ind.App. 283, 292 N.E.2d 837, 841 (1973), or when the easement holder changes the use in a way that goes far beyond the purpose for which the easement was created, *see Selvia v. Reitmeyer,* 156 Ind.App. 203, 295 N.E.2d 869, 874 (1973). Applying these principles to the railroad purpose easements at issue in this case, the court concludes that, under Indiana law, the railroad purpose easements terminated when the railroad stopped using the easements for railroad purposes and instead transferred the easements to a trail operator for use as a recreational trail. Absent the continued imposition of trail use pursuant to the NITU, plaintiffs' properties would have reverted to plaintiffs in fee. Therefore, ... the "before" condition of plaintiffs' properties must be valued as property unencumbered by any railroad purpose easements. *Macy II,* 105 Fed.Cl. at 199. The Judge in *Macy II* based her conclusion on the theory that, but for the issuance of the NITU and the consequent trail use, the plaintiffs' property would have reverted to the plaintiffs in fee. *Id.*

The Indiana Supreme Court, in response to this court's request for certification stated, "[a] public recreational trail is not within the scope of a railroad easement and does not constitute a permissible shifting public use." *Howard, et al. v. United States,* 964 N.E.2d at 784. A compensable taking, therefore, occurred in this case when defendant issued an NITU because trail use exceeds the scope of the original easements. *See id.* at 782–84; *see also Ladd v. United States,* 630 F.3d 1015, 1019 (Fed.Cir.2010) ("It is settled law that a Fifth Amendment taking occurs in Rails–to–Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement."); *Toews v. United States,* 376 F.3d at 1376 ("it appears beyond cavil that use of these easements for a recreational trail-for walking, hiking, biking, picnicking, frisbee playing, with newly-

added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway-is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens."). The Indiana Supreme Court, in its opinion in response to this court's request for certification, however, declined to pass upon the effect of trail use that falls outside of the scope of railroad easements. *Howard, et al. v. United States,* 964 N.E.2d at 784 ("The Government also asserts that if 'railbanking and interim trail use fall outside the scope of railroad easements, [this Court] should then consider what the consequences of that finding would be under Indiana law.' This question is not among the questions certified by the Court of Federal Claims.") (internal citations omitted, bracket in original).

Plaintiffs assert that once takings liability has been established the issue of state law abandonment is not determinative. Plaintiffs argue that the issuance of the NITU and subsequent trail use has encumbered their fee interests, if not permanently, then virtually so. Plaintiffs analogize to *Ybanez v. United States,* 102 Fed.Cl. 82, 87 (2011), which states, " 'the extent of the taking depends not on plaintiffs' property interests at the time of the NITU, but rather "upon the nature of the state-created property interest that petitioners *would have enjoyed* absent federal action and upon the extent that the federal action burdened that interest." ' " *Id.* at 87 (quoting *Anna F. Nordhus Family Trust v. United States,* 98 Fed.Cl. 331, 336 (2011) (quoting *Preseault I,* 494 U.S. at 24, 110 S.Ct. 914)) (emphasis in original). In *Ybanez,* after finding that abandonment would have occurred under Texas law, but that the NITU prevented abandonment from occurring "under any law," the court stated that the NITU "allowed a use by the general public that exceeded the scope of the grant of easements to [the railroad]. This resulted in a taking of plaintiffs' reversionary rights...." *Ybanez v. United States,* 102 Fed.Cl. at 87.

In support of their theory on the proper measure of damages, plaintiffs cite to *Capreal v. United States,* 99 Fed.Cl. 133 (2011),

*Raulerson v. United States,* 99 Fed.Cl. 9, and *Biery v. United States,* 99 Fed.Cl. 565 (2011). In *Capreal* "[t]he railroad had easements that would have been extinguished under state law ... [and] [t]he NITU prevented this extinguishment." *Capreal v. United States,* 99 Fed.Cl. at 143–44. The *Capreal* court wrote "railbanking is too hypothetical and unlikely to serve as a railroad purpose" to limit "the extent of Defendant's liability ... to the incremental burden imposed by the trail use on the existing easement," and defendant could not mitigate its liability based on "the remote possibility of rail service being restored in the future." *Capreal v. United States,* 99 Fed.Cl. at 145–46. In *Raulerson,* because the government presented "[n]o evidence ... of a present intent to reinstate rail service in the future" it was not entitled to mitigate its damages because "provisions in the railbanking agreement that provid[ed] for reactivation of the railroad ... [were] self-serving and not indicative of the facts and circumstances at the time of the agreement." *Raulerson v. United States,* 99 Fed.Cl. at 12. In *Biery,* the "vague existential notion that maybe someday a railroad might possibly come back" did not mitigate defendant's damages because in Kansas "an easement acquired for railroad purposes is effective only so long as the easement is used for or in connection with active rail service." *Biery v. United States,* 99 Fed.Cl. at 577–78.[15] Although each of these cases arose in states other than Indiana, *Biery* was decided under Kansas law, *Capreal* was decided under Massachusetts law, and *Raulerson* was decided under South Carolina law, in each case the theoretical preservation of the easements for railroad purposes was found to be too remote and hypothetical.

Defendant argues that under Indiana law the railroad easements were never abandoned, alleging that both "Indiana statutory law precludes a finding of abandonment, and "Indiana common law preclude[ ] a finding of abandonment." Therefore, according to de-

fendant, "the most that has been taken is the right to exclude the general public from use of the right-of-way as a result of the conversion to a recreational trails." Defendant urges this court to adopt the holding of *Schneider v. United States,* No. 8:99–CV–315, 2003 WL 25711838 (D.Neb. Aug. 29, 2003), an unreported decision from the United States District Court of Nebraska, which defendant suggests stands for the proposition that "the issuance of the NITU imposed a new easement, rendering the United States liable for a taking. The *Schneider* court determined that the 'property owners should be allowed to recover from defendant all damages which their property has sustained by the new use ... if any, over and above the damages caused by the [previously] authorized use.'" *Id.* at *7 (quoting *Lucas v. Ashland Light, Mill & Power Co.,* 92 Neb. 550, 138 N.W. 761 (1912)) (alterations in original). The *Schneider* trial court decision, however, does not express the prevailing view on abandonment and is not binding on this court. Moreover, *Schneider* was decided under Nebraska state law and does not assist in understanding how to apply Indiana law. The plaintiffs also point out that the *Schneider* court decision "misapplied Nebraska law regarding extinguishing the easement when use is beyond the scope," as the *Lucas* decision, relied upon in *Schneider,* did not address the situation in the above captioned case in which the easements would have been extinguished, but instead addressed a use which was for the same purpose as the original easement.

According to the defendant, although the character of the burden of the easement may be different, the rights-of-way remain intact with reversionary right to the fee holder, despite their conversion for use as a recreational trail or railroad use. Defendant argues that while it has taken plaintiffs' right to unencumbered property, just compensation requires something less than full value

---

15. Plaintiffs also contend that Indiana Code section 32–23–11–7 is simply an acknowledgment of the defendant's power under the Supremacy Clause to prevent people in plaintiffs' position from regaining encumbered property, as supported by the *Schmitt* decision, which determined: "Section 7 merely recognizes what was

already *fait accompli* under federal law, which was that an authorized rails-to-trails conversion pursuant to the Rails–to–Trails Act would not constitute abandonment of the railroad right-of-way." *Schmitt v. United States,* 2003 WL 21057368, at *6.

of their unencumbered property because at some point the railroad easement may be reactivated, at which time the plaintiffs' property would be returned to the position it would have been in had no trail use been imposed and had the railroad easement never been, according to defendant, "abandoned."

Defendant also tries to confuse the issue before the court by alleging that, "[i]n this case, A & R Line, Inc.'s intent to abandon rail service on the right-of-way must not be confused with its intent to abandon the right-of-way easement. As recognized by the Indiana legislature, the sale of a railroad right-of-way for railbanking with interim trail use is not consistent with an intent to extinguish the easement for railroad use." For support defendant cites to *Moody v. Allegheny Valley Land Trust,* 601 Pa. 655, 976 A.2d 484, 491–92 (2009), arguing that the court held "that the sale of the right-of-way to a qualified railbanking organization is inconsistent with the conclusion that the railroad company meant to extinguish the right-of-way via abandonment." Indiana State law, not Pennsylvania State law, which was at issue in *Moody,* controls the case at bar. *See Preseault I,* 494 U.S. at 20, 110 S.Ct. 914 (O'Connor, J., concurring); *Toews v. United States,* 376 F.3d at 1371; *Preseault II,* 100 F.3d at 1534–49. Defendant does not cite to any Indiana case for the same proposition, nor does it appear that any Indiana case has ever held that railbanking would be considered a railroad purpose. Moreover, no Indiana case has relied upon, or even cited to, the *Moody* decision.

■■■ Under Indiana statutory law, the plaintiffs' railroad easements would not be considered abandoned. As the Indiana Supreme Court indicated, the Indiana statutes supersede Indiana common law and the highest state Court has so indicated. State law, while determining the technical property interests, however, does not control the determination of the valuation of property parcels for the purposes of determining the amount of federal money to be distributed to plaintiffs once a taking has been established pursuant to the Fifth Amendment to the United States Constitution. The question of how to distribute federal funds is for the federal sector, including federal courts to determine, and in this case it is for this court to establish the proper measure of just compensation due to plaintiffs. In this case, trail use has been determined as beyond the scope of the easements, resulting in a taking. Whether described as railbanked or not abandoned, the property would appear to be lost to the fee holder for all intents and purposes in perpetuity, since, most likely, trail use will continue or the easement interest could revert to the railroad. Although a theoretical possibility exists that the trail use could be permanently discontinued, the easement returned for railroad use, and then the railroad easement abandoned by the railroad under common law, with the property rights returned to the feeholders, a circumstance not addressed in the Indiana statute, there is no real prospect that the property owners will ever again have unencumbered use of their property. The government seeks to have the best of all worlds, effect the conversion of the plaintiffs' property to trail use by the issuance of the NITU, and avoid having to pay just compensation for the taking and conversion of the plaintiffs' property. The United States Court of Appeals for the Federal Circuit has stated:

> the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government. Whether the State's role in the matter should have resulted in liability for the state . . . is immaterial. The Federal Government authorized and controlled the behavior of the State in this matter, and the consequences properly fall there.

*Preseault II,* 100 F.3d at 1531. The Federal Circuit further noted, "[o]bviously the State could not simply by enactment of a statute immunize itself from the salutary provisions of the Fifth Amendment." *Id.* at 1551. The Federal Circuit in *Preseault II* rejected the defendant's argument and found that the plaintiffs' property interests at the time they were acquired were "defined not by the original conveyances, as understood pursuant to state law, but by the evolving enactment and implementation of federal railroad law. . . ." *Id.* at 1537.

Moreover, in *Preseault II*, the government made a final argument that a Vermont state statute regarding unused railroad rights-of-way owned by the State instructed the State to maintain the rights-of-ways for public purposes not inconsistent with future transportation purposes, i.e., to "railbank" the railroad rights-of-ways. The government alleged that the state statute, therefore, condoned and validated the government's action regarding the Preseaults' interest. *Id.* at 1551. The Federal Circuit concluded, however, that:

> One can hardly fault the State government for complying with its law. However, the statute does not say that such actions are without consequences to the property owners, nor does it say that the property owners will not, or must not, be compensated for such actions. The statute is in fact wholly silent on the question of compensation. Obviously the State could not simply by enactment of a statute immunize itself from the salutary provisions of the Fifth Amendment. The issue is not whether the State or Federal governments had the power or obligation to do what they did, but whether the Constitution requires that just compensation be paid as a consequence. The existence of the statute thus adds nothing to the Government's defense.

*Preseault II*, 100 F.3d at 1551–52 (footnotes omitted).

The United States may not point to 16 U.S.C. § 1247(d) as standing for the proposition that nothing has been taken from plaintiffs because federal law, or state law incorporating the same statute, prevented the rights-of-way from being abandoned.[16] If nothing else, defendant is responsible for having established a second easement because trail use exceeds the scope of the railroad purpose easements. *See Howard, et al. v. United States*, 964 N.E.2d at 784. The trail use occasioned by the defendant results in virtually perpetual easements, which are inconsistent with the intent of the original easements as acquired by prescription and commendation, and which deprive the current property holders of the use of their property without their consent.

In the above captioned *Howard* case, defendant has presented "[n]o evidence ... of a present intent to reinstate rail service in the future," so there is only a "vague existential notion that may someday a railroad might possibly come back." *Raulerson v. United States*, 99 Fed.Cl. at 12 (alterations in original); *see also Biery v. United States*, 99 Fed.Cl. at 577–78. The A & R Line apparently thought that the likelihood of railroad reactivation was so remote, and the possibility of future rail service across plaintiffs' property held such little value, that the A & R Line quit-claimed all interest in the rights-of-way, including the future right to the reactivated railroad easement, to Indiana Trails Fund, Inc. for $10.00. Moreover, the parties have represented to the court that the rails, switches and ties have been removed from the line and the A & R Line indicated that it had no intention to "salvage the bridges on the Line." Plaintiffs' entitlement to compensation for defendant's taking by creating a trail use easement on plaintiffs' property should not be diminished by the very remote possibility of rail service being restored at some unlikely and distant time in the future. *See Capreal v. United States*, 99 Fed.Cl. at 145–46.

## CONCLUSION

In the above captioned case, the Indiana Supreme Court has determined that trail use exceeds the scope of the railroad easements under Indiana law. A compensable taking, therefore, occurred under the Fifth Amendment of the United States Constitution. Once it is established that federal action occasioned a taking of plaintiffs' state law prop-

---

**16.** Although not at issue in the above captioned case, *Preseault II*, also informs a future possible circumstance in which the United States relies on the Indiana statutes, which cites to the Trails Act, and both the State of Indiana and the federal government point to the other as the responsible party for denying a landowner's interest. The Federal Circuit addressed a similar argument concluding that "[i]t would be absurd to deny the [plaintiffs'] their constitutional rights on the grounds that the State has concluded it was the Federal Government who did it, and the Federal Government has concluded it was the State. In sum, the Government cannot now point its finger at the State and say 'they did it, not us.' " *Preseault II*, 100 F.3d at 1551.

erty interests, it is for the federal courts, not state legislatures, to determine what qualifies as "just compensation" due from the federal treasury. The proper measure of damages is as plaintiffs have argued, the difference between the value of plaintiffs' property unencumbered by the railroad easement and the value of plaintiffs' property encumbered by a trail use easement subject to possible reactivation as a railroad easement. When the STB issued the NITU, the possibility that plaintiffs' unencumbered right to their property would ever become a reality became hypothetical and not within the normal range of probability. Because, for all practical purposes, defendant has encumbered plaintiffs' property rights in perpetuity, plaintiffs' cross-motion for partial summary judgment is **GRANTED.** The defendant's cross-motion for partial summary judgment is **DENIED.** Calculation of damages will be determined in further proceedings, to be established by separate Order.

**IT IS SO ORDERED.**

